# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| **STEPHANIE CAMPBELL**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:21-cv-00557-RK |
| v. | ) | |
| | ) | |
| **GANNETT COMPANY, INC., et al.**, | ) | |
| | ) | |
| Defendants. | ) | |

## OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON CLAIMS FOR DISGORGEMENT OF PROFITS

COMES NOW Stephanie Campbell and for her opposition to Defendants' Motion for Partial Summary Judgment on Plaintiff's Claims for Disgorgement of Profits (Doc. 90), states as follows:

# TABLE OF CONTENTS

**PLAINTIFF'S RESPONSE TO DEFENDANTS' PURPORTED STATEMENT OF UNCONTROVERTED MATERIAL FACTS** ........................................................................... v

*I.   General Objections to Defendants' State of Facts:* ................................................. v

*II.   Plaintiff's Responses to Defendants' Facts 1-50.* ............................................ viii

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS** ................................... xxviii

**BACKGROUND** ..................................................................................................... xxviii

   **DEFENDANTS** .................................................................................................. xxviii

   **THE C&R LICENSE** ............................................................................................ xxix

   **GANNETT'S RECEIPT OF PLAINTIFF'S PHOTOGRAPH** ........................................... xxx

   **GANNETT'S INFRINGEMENT** ............................................................................. xxxi

   **THE PUBLISHING DEFENDANTS** ....................................................................... xxxiv

   **DAMAGES** ...................................................................................................... xxxv

Introduction ..................................................................................................................... 1

**ARGUMENT & AUTHORITY** ................................................................................................ 1

   I.   Applicable Standard ................................................................................................. 1

   II.   Summary Judgment on Disgorgement of Profits Is Inappropriate ............................ 2

   a.   Proof that Revenue was limited to Infringing Acts Satisfies Burden .................... 2

   b.   Since Plaintiff's met their Burden, Defendants had to Apportion the Profits ........ 3

   c.   Documentary Evidence Supports Nexus ............................................................. 5

CONCLUSION .................................................................................................................. 12

Case 4:21-cv-00557-RK   Document 113   Filed 03/06/23   Page 2 of 49

**Cases**

*Anderson v. Dillard's Inc.*, 109 F.Supp.2d 1116 (E.D.Mo.2000) .................................................. vi

*Andreas v. Volkswagen of America, Inc.*, 336 F.3d 789 (8th Cir. 2003) ...................... 3, 4, 5, 8, 10

*Andreas v. Volkswagen of American, Inc.*, 336 F.3d 789 (8th Cir.2003) ...................... 3, 4, 5, 8, 10

*Balsley v. LFP, Inc.*, 691 F.3d 747 (6th Cir. 2012).......................................................................... 9

*Bauer v. Curators of the Univ. of Missouri*, No. 07-4044-CV-C-SOW, 2009 WL 10659036
 (W.D. Mo. Dec. 18, 2009)........................................................................................................... v

*Bouchat v. Baltimore Ravens Football Club*, 346 F.3d 514 (4th Cir.2003) .......................... 10, 11

*Celotex Corporation v. Catrett*, 477 U.S. 317 (1986). ................................................................... 1

*Crossley v. Georgia–Pac. Corp.*, 355 F.3d 1112 (8th Cir.2004).................................................. vii

*Dash v. Mayweather*, 731 F.3d 303 (4th Cir. 2013) ................................................................. 9, 10

*DG & G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820 (8th Cir.2009)...... vi

*ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616 (6th Cir. 2020) .................................................... 9

*Estate of Vane v. The Fair, Inc.*, 849 F.2d 186 (5th Cir.1988), *cert. denied*, 488 U.S. 1008, 109
 S.Ct. 792, 102 L.Ed.2d 783 (1989) ........................................................................................... 4

*Filtration Sols. Worldwide, Inc. v. Gulf Coast Filters, Inc.*, No. 08-0102-CV-W-FJG, 2010 WL
 148442 (W.D. Mo. Jan. 12, 2010)............................................................................................. v

*Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110 (2d Cir.1986) ................................... 2

*Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505 (9th Cir.1985) .............. 3, 4, 5

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588
 (1985) ..................................................................................................................................... 3, 9

*Henry v. Johnson*, No. 16-4249-CV-C-WJE, 2018 WL 10158858 (W.D. Mo. Aug. 10, 2018) .... v

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ...................................................................................... 2

*Infogroup, Inc. v. DatabaseLLC*, 956 F.3d 1063 (8th Cir. 2020) ................................................. 2

*Jackson v. Crawford*, 2016 WL 5417204, *19, note 1 (W.D.Mo. 2016) ...................................... v

*Kirklin v. Joshen Paper & Packaging of Arkansas Co.*, 911 F.3d 530 (8th Cir. 2018)................ vi

*Mackie v. Rieser*, 296 F.3d 909 (9th Cir.2002)........................................................................ 3, 5

*Nw. Bank & Tr. Co. v. First Illinois Nat'l. Bank*, 354 F.3d 721 (8th Cir. 2003) .................... v, vii

*On Davis v. the Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001)............................................................... 8

*On Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001), as amended (May 15, 2001)............. 2, 8

Case 4:21-cv-00557-RK   Document 113   Filed 03/06/23   Page 3 of 49

*Planned Parenthood Minnesota v. Rounds*, CIV. 05-4077-KES, 2009 WL 73797 (D.S.D. Jan. 7, 2009)......................................................................................................................... vii

*Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir.2004) ........................................ 11

*Reeves v. Safeway Stores, Inc.*, 121 Cal. App. 4th 95, 105–06, 16 Cal. Rptr. 3d 717 (2004) ...... vii

*Royal American Managers, Inc. v. International Surplus Lines Ins. Co.*, 760 F.Supp. 788 (W.D. Mo. 1991) .......................................................................................................................... vii

*Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940)  3, 9

*Stanley v. Lafayette Life Ins. Co.*, No. 3:13-CV-05137-MDH, 2015 WL 5349736 (W.D. Mo. Sept. 14, 2015) ................................................................................................... v, vi, vii

*Tolen v. Ashcroft*, 377 F.3d 879 (8th Cir. 2004) ......................................................................... vii

*United States v. Dunkel*, 927 F.2d 955 (7ᵗʰ Cir.1991)................................................................. vii

*Univ. of Colo. Found. v. Am. Cyanamid Co.*, 196 F.3d 1366 (Fed.Cir.1999), *cert. denied*, 529 U.S. 1130, 120 S.Ct. 2005, 146 L.Ed.2d 956 (2000) ................................................. 3

*Walker v. Forbes, Inc.*, 28 F.3d 409  (4th Cir.1994)..................................................................... 2

*Willert Home Prod., Inc. v. Driveline Retail Merch., Inc.*, No. 4:20-CV-01151-MTS, 2021 WL 6932966 (E.D. Mo. Dec. 3, 2021) ............................................................................. vi

*Wood v. Houghton Mifflin Harcourt Pub. Co.*, 589 F, Supp. 2d 1230, 1245 (2008) .................... 8

*Wood v. Houghton Mifflin Harcourt Pub. Co.*, 589 F. Supp. 2d 1230 (D. Colo. 2008)............. 3, 8

**Statutes**

17 U.S.C. § 504................................................................................................................................ 5

17 U.S.C. § 504(b) ...................................................................................................................... 3, 9

**Rules**

Fed.R.Civ.P.56(c) .......................................................................................................................... 1

Local Rule 56.1................................................................................................................................ v

Case 4:21-cv-00557-RK   Document 113   Filed 03/06/23   Page 4 of 49

## PLAINTIFF'S RESPONSE TO DEFENDANTS' PURPORTED STATEMENT OF UNCONTROVERTED MATERIAL FACTS

***I.***     ***General Objections to Defendants' State of Facts:***

Defendants' "Statement of Uncontroverted Facts" ("SOF") are objectionable as described in the following numbered paragraphs and the Court may strike and/or disregard facts that do not comply with F.R.C.P. 56 and Local Rule 56.1. Defendants have improperly utilized an omnibus statement of facts [Doc. 96] for each of their serial summary judgment motions in violation of Local Rule 56.1 and without any effort to identify which facts relate to which motion. This practice creates unnecessary confusion and burden for the Court, including necessitating Plaintiff's opposition briefs including responses and additional disputed facts addressing all fifty facts in all oppositions. Objections to a movant's statement of facts are properly raised in a response to a motion for summary judgment and may be considered when determining whether there are no disputes of material fact. *Filtration Sols. Worldwide, Inc. v. Gulf Coast Filters, Inc.*, No. 08-0102-CV-W-FJG, 2010 WL 148442, at \*13 (W.D. Mo. Jan. 12, 2010); *Bauer v. Curators of the Univ. of Missouri*, No. 07-4044-CV-C-SOW, 2009 WL 10659036, at \*2 (W.D. Mo. Dec. 18, 2009).

1.     Given that Defendants incorporate all fifty (50) of their facts into all six (6) of their motions without identifying which facts relate to which motion(s), Plaintiff objects that Defendants' SOF is not concise as required by Local Rule 56.1 and amounts to three hundred (300) supposedly material facts for the Court and the parties to unpack. *See, e.g.*, *Jackson v. Crawford*, 2016 WL 5417204, \*19, note 1 (W.D.Mo. 2016); *Stanley v. Lafayette Life Ins. Co.*, No. 3:13-CV-05137-MDH, 2015 WL 5349736 (W.D. Mo. Sept. 14, 2015); *Nw. Bank & Tr. Co. v. First Illinois Nat'l. Bank*, 354 F.3d 721, 725 (8th Cir. 2003) (89 facts was "the legal equivalent of a Rube Goldberg machine, exceedingly complicated and inevitably useless"); *Henry v. Johnson*, No. 16-4249-CV-C-WJE, 2018 WL 10158858, at \*2 (W.D. Mo. Aug. 10, 2018).

2.      Plaintiff objects that the SOF includes compound, lengthy and expansive statements, often with block quotes and string citations contained within the "fact" itself. Courts generally require that each numbered statement of fact should be a single sentence rather than multiple or compound sentences containing statements of fact under a single number. *Willert Home Prod., Inc. v. Driveline Retail Merch., Inc*., No. 4:20-CV-01151-MTS, 2021 WL 6932966, at *1 (E.D. Mo. Dec. 3, 2021); *Stanley*, 2015 WL 5349736, at *1. Specifically, Plaintiff objects to ¶¶ 2, 3, 4, 15, 19, 28, 30, 31, 33, 35, 38, 39, 42, 46, and 50, and asks the Court strike or disregard the same.

3.      Plaintiff objects that Defendants' SOF improperly contains facts that are plainly immaterial. *Willert Home Prod., Inc.*, 2021 WL 6932966, at *1 (plainly immaterial and plainly controverted facts have no place in a SOF); *Kirklin v. Joshen Paper & Packaging of Arkansas Co*., 911 F.3d 530, 533–34 (8th Cir. 2018) at *1. Many of Defendants' "facts" are not referenced in any of Defendants' suggestions (*see, e.g*., ¶¶ 1, 2, 3, 4, 5, 6, 7, 8, 9, 14, 15, 16, 17, 18, 24, 25, 26, 27, and 45) and appear to be wholly unrelated to this or any of Defendants' other five motions.

4.      Plaintiff objects that Defendants' SOF contains facts without proper supporting evidence. Documents must be properly authenticated by an affidavit made on personal knowledge setting forth admissible evidence or per Fed.R.Civ.P. 56(e). *Anderson v. Dillard's Inc.*, 109 F.Supp.2d 1116, 1121 (E.D.Mo.2000); *DG & G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 825–26 (8th Cir.2009). Specifically, Plaintiff objects to ¶¶ 1, 2, 9, 11, 12, 13, 14, 15, 16, 28, 29, and 37 and asks the Court to strike or disregard the same.

5.      Plaintiff objects that Defendants' SOF improperly contains citations to materials that do not fully support the purported fact(s). *Kirklin*, 911 F.3d at 533–34. Specifically, Plaintiff objects to ¶¶ 5, 6, 7, 8, 25, 27, 28, 30, 33, 40 and 49 and asks the Court to disregard the same.

6. Plaintiff objects that Defendants SOF improperly presents evidence as a material fact. *See, e.g., Tolen v. Ashcroft*, 377 F.3d 879, 884 n. 3 (8th Cir. 2004); *Royal American Managers, Inc. v. International Surplus Lines Ins. Co.*, 760 F.Supp. 788, 791 (W.D. Mo. 1991). Many of Defendants "facts" merely consist of a statement that someone testified _____ or that someone believed _____ followed by a block quote of testimony or opinion. What someone testified to or said about an event, as opposed to the event itself, is not a proper material fact for summary judgment motions. *Reeves v. Safeway Stores, Inc.*, 121 Cal. App. 4th 95, 105–06, 16 Cal. Rptr. 3d 717, 724–25 (2004) (condemning moving party's attempt to circumvent the issues in a case by submitting them in an attributive form). Specifically, Plaintiff objects to ¶¶ 38, 41, and 42 and asks the Court to strike or disregard the same.

7. Plaintiff objects that Defendants' SOF contains improper argument. *See Nw. Bank & Tr. Co.*, 354 F.3d at 725; *Planned Parenthood Minnesota v. Rounds*, CIV. 05-4077-KES, 2009 WL 73797, at *3 (D.S.D. Jan. 7, 2009); *Stanley*, 2015 WL 5349736, at *1. Plaintiff objects to ¶¶ 13, 15, 16, 17, 18, 19, 38, 40, 41 and 50 and asks the Court to strike or disregard the same.

8. Finally, Plaintiff objects that the SOF are not organized in a manner that would permit the Court or Plaintiff to readily identify which claims, motions, or arguments a fact relates to. Plaintiff respectfully submits that **should any one of Defendants' 50 facts be determined to be in dispute, the Court may deny each of Defendants' six motions entirely**. *See Crossley v. Georgia–Pac. Corp.*, 355 F.3d 1112, 1114 (8th Cir.2004) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")); *Nw. Bank & Tr. Co.*, 354 F.3d at 725 (explaining courts need not engage in the proverbial search for a needle in a haystack where a moving party fails to comply with Rule 56.1).

## II.    Plaintiff's Responses to Defendants' Facts 1-50.

<u>The Parties</u>

1.    Plaintiff Stephanie Campbell is a photographer. (Complaint, Doc. #: 1, ¶ 3).

**RESPONSE: Uncontroverted but see general objections ¶ 4.**

2.    Defendant Gannett Co., Inc. ("Gannett") is a media and publishing company, owning more than 300 local and national publications and news websites in the United States. (Complaint, Doc. #: 1, ¶¶ 4, 34-38).

**RESPONSE: Controverted in part and see general objections ¶¶ 2, 4. The Complaint never states that Gannett, Co., Inc. owns more than 300 local and national publications. Complaint ¶ 4 states that Gannett is a media company located in McLean, Virginia. Gannett operates a large media publication business which has an international reach and includes providing digital content to others. ¶¶ 34 through 38 never state that Gannett "owns" any publications. (Complaint, Doc. #: 1, ¶¶ 34-38). Each of the Defendants are owned by non-parties. (Ex. S, Defendant Gannett Co. Inc.'s Answers to Interrogatories 2; Ex. C, Chart of Ownership. See also response to SOFs Nos. 3, 4.**

3.    Defendant Gannett Satellite Information Network, LLC, an indirect wholly-owned subsidiary of Gannett, is a media company which owns, *inter alia*, USA Today and the Asbury Park Press. (Defendant Gannett Satellite Information Network, LLC's Objections and Answers to Plaintiff's First Set of Interrogatories ("GSIN IG Resp.") Nos. 2 and 3 – Exhibit A).

**RESPONSE: Controverted and see general objections ¶ 2. USA Today and Asbury Park Press are both separate unincorporated divisions of Gannett Satellite Information Network, LLC which is owned by Gannett Media Corp., a non-party. (See, e.g., Ex. T, Defendant Gannett Satellite Information Network, LLC's Answers to Interrogatories 2, 3 & 4; Ex. C, p. 11, Chart of Ownership).**

4.    Each of the 13 remaining Defendants (The Journal Sentinel, Inc.; Gannett MHC Media Inc.; Phoenix Newspapers, Inc.; Gannett Vermont Publishing, Inc.; Gannett River States Publishing Corporation; Gatehouse Media Ohio Holdings II, Inc.; Memphis Publishing Company: The Courier Journal, Inc.; The News Journal Company; Des Moines Register & Tribune Company; LMG Rhode Island Holdings, Inc.; CA Florida Holdings, LLC; and Visalia Newspapers, LLC)

(hereinafter, along with Defendant Gannett Satellite Information Network, LLC, collectively referred to as "Gannett Publication Defendants") is a media company and indirect, wholly-owned subsidiary of Gannett. (Complaint, Doc. #: 1, ¶¶ 6-20, 109-13, 143-47, 177-81, 211-15, 245-49, 279-83, 313-17, 347-51, 381-85, 415-20, 450-55, 485-90, 520-25, 555-60, 590-55; *see also* Defendant Gannett Co. Inc.'s Objections and Answers to Plaintiff's First Set of Interrogatories, ("Gannett IG Resp.") No. 2 – Exhibit B).

**RESPONSE: Controverted and see general objections ¶¶ 2, 5. Nothing in the Complaint states that the listed Defendants are wholly owned subsidiaries of Gannett and Defendants' denial of Doc. 1, ¶¶ 110, 144, 178, 212, 246, 280, 314, 348, 416, 451, 486, 521, 556, 591 generates a dispute of this fact. None of the Defendants are owned by Gannett Co, Inc. Rather, each of the Defendant publications are unincorporated divisions of parties/entities as listed below:**

> **Providence Journal is an unincorporated division owned by The Journal Sentinel, Inc., which is owned by Boat Spinco, Inc., a non-party; Argus is an unincorporated division owned by Gannett MHC Media Inc., one of many companies owned by Gannett Media Corp., a non-party; AZ Central is an unincorporated division owned by Phoenix Newspapers, Inc., one of many publications owned by Gannett Media Corp., a non-party; Burlington Free Press is an unincorporated division owned by Gannett Vermont Publishing, Inc., one of the many publications owned by Gannett Satellite Information Network, LLC; Clarion Ledger is an unincorporated division owned by Gannett River States Publishing Corporation, one of the many publications owned by Gannett Media Corp., a non-party; The Columbus Dispatch is an unincorporated division owned by Gatehouse Media Ohio Holdings II, Inc., which is owned by Gatehouse Media Ohio Holdings, Inc., a non-party; Commercial Appeal is an unincorporated division owned by Memphis Publishing Company, which is owned by Desk Spinco, Inc., a non-party; The Courier-Journal is an unincorporated division owned by The Courier Journal, Inc., which is one of the many companies owned by Gannett Media Corp., a non-party; Delaware Journal is an unincorporated division owned by The News Journal of Wilmington, DE, one of the many companies owned by Gannett Satellite Information Network, LLC; Des Moines Register is an unincorporated division owned by Des Moines Register & Tribune Company, which is owned by Gannett Media Corp., a non-party; Providence Journal is an unincorporated division owned by LMG Rhode Island Holdings, Inc., which is owned by Local Media Group, Inc, a non-party; Florida Times is an unincorporated division owned by CA Florida Holdings, LLC, which is owned by Cummings Acquisition, LLC, a non-party; and Visalia Times-Delta is an unincorporated division owned by Visalia Newspapers, LLC, which is owned by Gannett Media Services, LLC, a non-party.**

**(See, e.g., Ex. S, Defendant Gannett Co., Inc.'s Answer to Interrogatory 2; Ex. C, p. 4, 6, 8, 10-12, 16, 20, 21, Chart of Ownership). Ultimately, Defendants created distinct corporate entities to shield exposure for each entities' individual liability and now attempt to agglomerate themselves for the purpose of further limiting their liability.**

5.     Gannett owns and maintains websites for all publications under its umbrella, including all Defendants herein. (Padavick Dep. at 28:19-23 – Exhibit C).

**RESPONSE: Controverted as to the term "maintains" and see general objections ¶ 5. Each digital publication makes the decision about what content goes on its website. (Ex. D, Padavick Dep., 96:10-98:8, 112:2-21, 136:11-137:5, 139:7-20, 153:25-154:22).**

6.     Each Gannett Publication Defendant has access to Gannett's proprietary content management system, called Presto. (Gannett IG. Resp., No. 6 – Exhibit B; *see also* Padavick Dep. at 119:16-120:15 – Exhibit C; Complaint, Doc. #: 1 ¶¶ 54-55, 114, 148, 182, 216, 250, 284, 318, 421, 456, 491, 526, 561, 596).

**RESPONSE: Controverted as to the term "access" and see general objections ¶ 6. The Presto content library ("Presto Library") is provided by and maintained by Gannett and Gannett's employees. (Ex. D, Padavick Dep., 119:12-122:9, 126:23-127:16). See also Plaintiff's response to ¶ 5.**

7.     Each Gannett Publication Defendant is able to share content with one another by uploading content to Presto. (Gannett IG Resp., No. 6 – Exhibit B; *see also* Padavick Dep. at 119:16-120:15; 121:20-23 – Exhibit C; Complaint, Doc. #: 1 ¶¶ 54-55, 114, 148, 182, 216, 250, 284, 318, 421, 456, 491, 526, 561, 596).

**RESPONSE: Controverted in part as to "able to share" and see general objections. The Presto Library is used to create and house content and for Gannett publications to obtain content. However, Gannett's Copyright Guide, provided as part of the onboarding process at Gannett states that "[s]imply because a photo has been used by another Gannett publication, or appears in Presto…, does not mean we have permission to use that photo again without restrictions." The Copyright Guide continues, "if the photo was taken by an employee or freelancer of a Gannett publication, contact the site that originally posted the photo to confirm that there are no restrictions on your use of the photo. If the photo was from AP, Getty or another source, ensure that your use of the photo complies with the use restrictions imposed by that source." (Ex. N, Suter Dep. 79:23-80:25; Ex. D, Padavick Dep., 53:2-21, 119:16-120:9; Ex. H, Suter Dep. Ex 8, Copyright Guide).**

x

8. Once content is uploaded to Presto, each Gannett Publication Defendant is able to publish that content to in its respective website by linking to the Presto ID associated with that content. (Padavick at 104:15-19; 139:2-23 – Exhibit C).

**RESPONSE: Controverted in part as to "able to publish" and see general objections. According to Gannett's Copyright Guide, provided as part of the onboarding process at Gannett, states that "[s]imply because a photo has been used by another Gannett publication, or appears in Presto…, does not mean we have permission to use that photo again without restrictions." The Copyright Guide continues, "if the photo was taken by an employee or freelancer of a Gannett publication, contact the site that originally posted the photo to confirm that there are no restrictions on your use of the photo. If the photo was from AP, Getty or another source, ensure that your use of the photo complies with the use restrictions imposed by that source." Further, Mr. Padavick refuted that proposition when he stated that "individual sites are not actively publishing content across their sites at this level of detail. Content out of the Presto Library is available to be promoted" (Ex. D, Padavick 53:2-21, 121:15-122:9, 137:25-139:6; Ex. H, Suter Dep. Ex 8, Copyright Guide).**

<u>The Sowers Photo</u>

9. On August 11, 2017, Plaintiff took the following photograph of National Football League (NFL) coach Katie Sowers ("Sowers Photograph"):



(Complaint, Doc. #: 1, ¶ 30).

**RESPONSE: Controverted in part and see general objections. The image presented above is a poor reproduction with a lower resolution from the image which Defendants captured. As**

presented, the reproduction appears to be pixilated and distorted which is not present in the original image. **(See Ex. Y, Padavick Depo Ex. 19).**

10.    Plaintiff describes the Sowers Photo as a "very artistic picture that tells a story,"

and not "just a snapshot." (Campbell Dep. at 115:3-7; 116:3-4 – Exhibit D).

**RESPONSE: Controverted in part to the extent this fact minimizes Plaintiff's Photograph or Plaintiff's description thereof and see general objections. Plaintiff admits the quoted descriptors have been used, however.**

The Catch&Release License

11.    On or about January 26, 2020, Plaintiff entered into a Copyright License Agreement

("License") with Catch&Release for use of the Sowers Photo in a Super Bowl commercial.

(Campbell Dep. Ex. CC (PLT_000126-33) – Exhibit E; Gannett_campbell_000023-30 – Exhibit

F).

**RESPONSE: Controverted in part and see general objections ¶ 4. Plaintiff does not dispute that it entered into a Copyright License Agreement on January 26, 2020 with Catch&Release. However, Plaintiff testified that her understanding of the agreement with Catch&Release was that the license was limited to a one-time use license limited to a commercial in the Super Bowl. Plaintiff controverts that ¶ 11 accurately and or completely describes the terms of the limited release. (Ex. R, Campbell Dep. Sealed, 68:7-71:12; Ex. A, Bybee Rpt., p.14; Ex. J, License Agreement).**

12.    The License provides, *inter alia*:

You hereby grant to Catch&Release an unlimited (including all lifts, edits and versions) non-exclusive, worldwide, all channels, irrevocable, license to use,

You also grant Catch&Release a worldwide, non-exclusive, limited, perpetual, irrevocable, royalty free license to copy, reproduce and publicly display the Content on Catch&Release's website and in other Catch&Release promotional materials in any media whatsoever (whether now known or hereafter developed).

(Campbell Dep. Ex. CC (PLT_000126-33) – Exhibit E; Gannett_campbell_000023-30 – Exhibit

F).

**RESPONSE: Controverted in part and see general objections ¶ 4. Plaintiff does not dispute that it entered into a Copyright License Agreement on January 26, 2020 with Catch&Release or that the quoted language appears therein. However, Plaintiff testified that her**

understanding of the agreement with Catch&Release was that the license was limited to a one-time use and was also limited to a commercial in the Super Bowl. **(Ex. R, Campbell Dep. Sealed, 68:7-71:12; Ex. J, License Agreement).**

13. The License included no requirement for attribution or other disclosure of Plaintiff's copyright. (Campbell Dep. Ex. CC (PLT_000126-33) – Exhibit E; Gannett_campbell_000023-30 – Exhibit F; *see also* Campbell Dep. at 76: 5-77:18 – Exhibit D).

**RESPONSE: Controverted and see general objection ¶¶ 4, 7 . The License Agreement with Catch&Release states that Plaintiff retains all ownership rights in the content, which is consistent with Plaintiff's understanding. Included in Plaintiff's ownership rights are her independent right of attribution and integrity under 17 U.S.C. § 106A. Because the License agreement did not require that Plaintiff relinquish her legal rights under § 106A (except against the Producers), she retained her rights of attribution. (*See* Ex. Q, Campbell, 18:23-19:6; Ex. R, Campbell Dep. Sealed 71:20-72:2; Ex. J, License Agreement pg. 2).**

14. As consideration for the License, Plaintiff was paid $____ (amount redacted pursuant to Plaintiff's designation as Attorneys Eyes Only under the Protective Order (Doc. #: 46). (Campbell Dep. Ex. CC (PLT_000126-33) – Exhibit E; Gannett_campbell_000023-30 – Exhibit F).

**RESPONSE:  Controverted in part and see general objection¶¶ 4, 7. Plaintiff does not deny that she received an initial license fee under the Catch&Release Agreement, but the contract does not limit Plaintiff to receiving additional compensation or license fees. Further, the term consideration is a legal term of art which is not appropriate for a Statement of Facts (*See* Ex. Q, Campbell, 18:23-19:6; Ex. R, Campbell Dep. Sealed 71:20-72:2; Ex. J, License Agreement pg. 1).**

### The "Be The One" Microsoft Ad

15. Pursuant to the License, the Sowers Photo was used in a commercial for Microsoft entitled "Be The One" ("BTO Ad"). The BTO Ad was about NFL coach Katie Sowers and her achievement as one of the first female NFL coaches and the first woman to coach at a Super Bowl. (BTO Ad – Exhibit G).

**RESPONSE: Controverted in part and see general objections ¶ 2, 4, 7. Plaintiff does not dispute that it entered into a Copyright License Agreement on January 26, 2020 with Catch&Release. However, Plaintiff testified that her understanding of the agreement with**

Catch&Release was that the license was limited to a one-time use license limited to a commercial for a Microsoft Surface product featuring Katie Sowers in the Super Bowl. (*See* **Ex. Q, Campbell, 18:23-19:6; Ex. R, Campbell Dep. Sealed 71:20-72:2; Ex. J, License Agreement**).

16.     The BTO Ad displayed the Sowers Photo at about the 40-second mark. (BTO Ad

– Exhibit G).

**RESPONSE: Controverted in part and see general objection ¶¶ 4, 7. Plaintiff admits that a depiction of her photograph was included in the Microsoft BTO commercial at approximately the 40-second mark. However, the term display has a legal meaning under Copyright law and therefore, Plaintiff's further object to and dispute the attempt to include a legal definition within a statement of fact. *See* 17 U.S.C. § 101.**

17.     The BTO Ad was telecast during the NFL Super Bowl on 2020. (Gannett IG

Resp., Nos. 16 and 17 – Exhibit B; Campbell Dep. at 46:16-18 – Exhibit D).

**RESPONSE: Controverted in part as to the term "telecast" and see general objections. Plaintiff admits that she licensed her photograph for use as part of the Microsoft BTO in the Super Bowl. Plaintiff further objects to and disputes the term telecast, which appears to be related to telecast rights and Plaintiff testified that her understanding of the agreement with Catch&Release was that the license was limited to a one-time use license limited to a commercial in the Super Bowl. (Ex. Q, Campbell Dep., 18:23-19:6, 48:5-16; Ex. R, Campbell Dep. Sealed 68:7-71:12, 71:20-72:2; Ex. J, License Agreement).**

18.     In addition to the Super Bowl telecast, the BTO Ad was published on YouTube.

(Campbell Dep. at 46:14-15 – Exhibit D).

**RESPONSE: Controverted in part as to the term "published" and see general objection ¶ 7. Plaintiff does not dispute that the BTO commercial was broadcast during the Super Bowl in 2020. Plaintiff does object to and controvert the use of the term "published" to the extent Defendants are using it as a term of art under copyright law since it has significance and implies a distribution of copies to the public. Plaintiff did not authorize nor was she aware of any distribution of any copies of the BTO commercial being made to the public. Plaintiff understood that her photograph was going to be used as part of the BTO commercial which aired during the Super Bowl. Plaintiff also understood that the BTO commercial was available on YouTube. YouTube has a policy preventing viewers from downloading videos. Specifically, the YouTube Terms of Service state that "use of the Service" prohibits "1. Access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except… with prior written permission from YouTube and, if applicable, the respective rights holders." (Ex. Q, Campbell Dep., 18:23-19:6, 48:5-16; Ex. R, Campbell Dep. Sealed 68:7-71:12, 71:20-72:2; Ex. J, License Agreement; Ex. I, Campbell Aff.). See also Plaintiff's response to ¶ 17.**

19.     The Sowers Photo appeared in the BTO Ad without any attribution, restrictive language, or copyright management information associated with the photograph. (BTO Ad – Exhibit G; *see also* P. Dep. at 76:13-16; 77:15-18 – Exhibit D).

**RESPONSE: Controverted and see general objections ¶¶ 2, 7. The Sowers Photo appeared in the BTO commercial which was broadcast during the Super Bowl. In addition, the commercial was on YouTube. The BTO commercial on YouTube, included copyright management information, attribution. The BTO commercial included the title of the work along with the owner of the commercial which were modified by Defendant without permission. In addition, YouTube included terms of service which restricted Defendants from using YouTube to gain "access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except… with prior written permission from YouTube and, if applicable, the respective rights holders." (Ex. Q, Campbell Dep., 18:23-19:6, 48:5-16; Ex. R, Campbell Dep. Sealed 68:7-71:12, 71:20-72:2; Ex. J, License Agreement; Ex. I, Campbell Aff., ¶ 4). See also Plaintiff's response to ¶ 17.**

## Ad Meter

20.     Every year since 1989, Gannett has conducted a survey of Super Bowl commercials, called "Ad Meter." (Suter Dep. at 19:10-20:14; 28:12-29:9; 35:11-36:15 – Exhibit H; Gannett IG Resp., No. 16 – Exhibit B; Gannett_Campbell_000224 – Exhibit I).

**RESPONSE: Uncontroverted for purposes of summary judgment but see general objections.**

21.     The purpose of Ad Meter is to gauge and rate audience perceptions of Super Bowl commercials. (*Id.*)

**RESPONSE: Controverted. The purpose of Ad Meter is to generate revenue and sell ads. (Ex. N, Suter, 11:1-4; 21:5-10; 26:13-15).**

22.     Every year since 2012, Ad Meter has been conducted online, and anyone 18 years or older may register to rate each commercial submitted to Ad Meter on a scale of one to ten. (*Id.*).

**RESPONSE: Uncontroverted for purposes of summary judgment but see general objections.**

23.     Once the voting period closes the evening of the Super Bowl, the commercials submitted to Ad Meter are ranked and the results are published. (*Id.*).

**RESPONSE: Controverted in part as to the term "published" and see general objections. Plaintiff does not dispute that ranked results appear on the Ad Meter platform after the Super Bowl but Plaintiff does controvert and object to the use of the term "published" to the extent Defendants are using it as a term of art in copyright law of legal significance and implying a distribution of copies to the public. Plaintiff did not authorize nor was she aware of any distribution of any copies of the Microsoft BTO commercial being made to the public. Plaintiff understood that her photograph was going to be used as part of the Microsoft commercial which aired during the Super Bowl. Plaintiff also understood that the Microsoft BTO commercial was available on YouTube. However, YouTube has a policy of preventing viewers from downloading videos. Specifically, the YouTube Terms of Service state that "use of the Service" prohibits "1. Access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except... with prior written permission from YouTube and, if applicable, the respective rights holders." (Ex. Q, Campbell Dep., 18:23-19:6, 48:5-16; Ex. R, Campbell Dep. Sealed 68:7-71:12, 71:20-72:2; Ex. J, License Agreement; Ex. E, YouTube Terms of Service). See also Plaintiff's response to ¶¶ 17.**

24.    Defendants do not create the Super Bowl commercials used in Ad Meter. (Suter Dep. at 28:2-29:22 – Exhibit H; Gannett IG Resp., No. 16 – Exhibit B).

**RESPONSE: Controverted in part and see general objections. Plaintiff admits that Defendants do not create the commercials themselves, however Defendants do create the platform, sponsored content and other data and information that appears thereon and surrounding the commercials. (Ex. N, Suter, 28:2-29:22; 35:11-20; 40:18-24; 56:15-17).**

25.    Advertisers and ad agencies do not pay Defendants to include their Super Bowl commercials in Ad Meter, nor do they pay for Defendants' news stories about Ad Meter. (Suter Dep. at 35:2-4 – Exhibit H; Gannett IG Resp., No. 16 – Exhibit B).

**RESPONSE: Controverted in part as to the term "to include" and see general objections. Plaintiff does not dispute that there is no separate fee to submit embedded YouTube links to a Super Bowl commercial for consideration on Ad Meter. However, sponsors, advertisers and ad agencies whose Super Bowl commercials appear on Ad Meter also pay Defendants for advertisements on Ad Meter. (Ex. N, Suter Dep, 34:9-11; Ex. U, Deposition of Matthew Moran ("Moran Dep.") 23:9-24:21).**

26.    Brands or ad agency participants in Ad Meter voluntarily submit their Super Bowl commercials to Ad Meter by uploading their commercials exactly as they are to be seen during the

Super Bowl to YouTube prior to the game. (Suter Dep. at 28:12-29:9; – Exhibit H; Gannett IG Resp., No. 16 – Exhibit B; Gannett_campbell_000001-2 – Exhibit J).

**RESPONSE: Controverted in part as to the term "uploading" and see general objections. Plaintiff does not dispute that Super Bowl commercials are submitted to Ad Meter as YouTube links but disputes that "Brands or ad agency" participants upload anything to the Ad Meter platform and disputes submitting Brands or ad agenc(ies) are the owners of the commercials and their contents. Plaintiff has retained all ownership rights in her photograph. (Ex. N, Suter Dep., 41:22-43:9; Ex. Q, Campbell, 18:23-19:6, Ex. R, Campbell Dep. Sealed 71:20-72:2; Ex. J, License Agreement).**

27.     Brands or ad agency participants in Ad Meter then send a YouTube link of their respective Super Bowl commercial to Gannett. (Suter Dep. at 28:12-15 – Exhibit H; *see also* Gannett_campbell_000001-2 – Exhibit J; Gannett IG Resp., No. 16 – Exhibit B).

**RESPONSE: Controverted in part as to the term "Brands or ad agency participants" as being unsupported and see general objections ¶ 5. Plaintiff controverts that brands or ad agencies participants have any claim of ownership to the commercials or their contents, including Plaintiff's photograph. See Plaintiff's response to SOMF 26.**

<u>Microsoft's Submission of the BTO Ad to Ad Meter</u>

28.     On or about January 28, 2020, WE Communications, on behalf of Microsoft, submitted the BTO Ad to Rick Suter, Digital Revenue Content Project Manager for the USA Today Sports Media Group, with an affirmative request to include the commercial in Ad Meter, stating: "I would like to submit Microsoft's 2020 Super Bowl ad, 'Be The One,' featuring Katie Sowers to the USA Today Ad Meter." (Gannett_campbell_000006-7 – Exhibit K; Gannett IG Resp. Nos. 16-17 –Exhibit B). The submission included a You Tube link to the commercial. *Id.*

**RESPONSE: Controverted in part and see general objections ¶¶ 2, 4. Plaintiff does not dispute that a YouTube link for the BTO Ad was submitted via an email from chawkins@we-worldwide.com to <u>rsuter@gannett.com</u> on or about January 28, 2020 or that the email included the quoted language. However, the BTO commercial email did not request that the commercial be included in Ad Meter, the video was not submitted to Rick Suter, Digital Revenue Content Project Manager for USA TODAY Sports Media Group, and did not state the submission was on behalf of Microsoft. (Ex. D, Padavick Dep., 165:25-166:24; Ex. L, Letter to McCann).**

29.     A second request followed, asking, "Can we please be included as part of the USA Today Ad Meter?" (Gannett_campbell_000006-7 – Exhibit K).

**RESPONSE: Uncontroverted for purposes of summary judgment but see general objections.**

30.     Gannett Defendant Publications provide news and information about Ad Meter and promote Ad Meter and the Super Bowl commercials in it as a package through Gannett's content management system, Presto. This is done "to drive awareness of the Ad Meter program overall and ideally to lead users back to the Ad Meter page itself where they can vote on their favorite ads." (Padavick Dep. at 82:7-24 – Exhibit C; *see also* Suter Dep. at 57:11-13 – Exhibit H).

**RESPONSE: Controverted in part and see general objections. Plaintiff does not dispute that at some level the Defendant Publications provide news and information or that the quoted testimony was provided by Mr. Padavick. However, the cited testimony does not mention that the Defendant Publications providing news and information about Ad Meter. In fact, Depo Exhibit 23, pg. 69 states that Gannett is a subscription –led and digitally-focused media and marketing solutions company. "Our strategy is focused on driving audience growth and engagement by delivering deeper content experiences to our consumers, while offering the products and marketing expertise our advertisers desire." Exhibit 23 also states that the local publications generate print and advertising revenue primarily by delivering advertising including digital advertising and marketing revenues generated primarily by online marketing products. In addition, circulation revenues are derived from print and digital subscriptions. See pg. 73. Exhibit 23 also states that the USA TODAY NETWORK, the content management platform, allows for content sharing capabilities across the local and national markets. "The scale or our consumer audience across the publishing segment makes us an attractive marketing partner to various local and national businesses trying to reach consumers. We reach 1 in 2 adults in the U.S., let by USA TODAY and amplified by local media brands within the USA TODAY NETWORK. We are the leading news media publisher in the U.S. in terms of circulation and sixth largest digital audience in the News and Information category…." Exhibit 23 also states: "The Publishing segment generates revenue primarily through advertising and subscriptions to our print and digital publications and, to a lesser extent, commercial printing and distribution. The USA TODAY NETWORK has developed an efficient operating model utilizing a dingle content management platform and integrated shared support for back-office operations such as content design and layout services, print and digital creative development, certain sales and service platforms, and accounting and finance." Ex. M, Annual Report, Wolfe Dep. Ex 23, pg. 69, 73, 5.**

<u>The Screenshot of the Sowers Photo</u>

31.     When a video is provided to Gannett, or when permission is obtained to use a video,

Gannett's standard practice was to use a screenshot from that video as a link for viewing the video.

(Padavick Dep. at 56:11-57:16 – Exhibit – C; Rindner Dep. at 57:9-58:9 – Exhibit L).

**RESPONSE: Controverted in part as to the term "Gannett's standard practice was to use a screenshot" and see general objections ¶ 2. Plaintiff does not dispute that screenshots were used as part of Ad Meter. However, the Ad Meter submission guidelines provide "please send a high-resolution screenshot from your ad…this will serve as a thumbnail image of your ad on Ad Meter". See Exhibit L. Based on the Ad Meter Submission Guidelines, screenshots were to be provided by the submitter. Screenshots for the BTO Ad were provided by chawkins@we-worldwide.com but Defendants did not use those screenshots for Presto. Further, Defendants own Copyright Guide stated that taking a screenshot or screengrab unless you have permission is not a good idea unless you have permission from the copyright owner. "For example, taking a screenshot of a video on YouTube and using the video still as a photo could expose us to an infringement claim." Additionally, Mr. Padavick testified that it was not Gannett's standard practice to grab a screenshot off of a video from YouTube. Instead, in violation of Gannett's policies, Defendants downloaded the BTO Ad from YouTube and then took a high resolution screengrab from the commercial that comprised Plaintiff's copyrighted photograph. Defendants then saved the high resolution screengrab of Plaintiff's copyrighted photograph to Presto and added tags including "USA TODAY" and "Ad Meter". (Ex. O, Rindner Dep., 45:10-16; 45:23-47:3; 52:1-52:22; Ex. N, Suter Dep., 77:21-79:7; Ex. D, Padavick Dep., 54:16-20; Ex. L, Letter to McCann; Ex. H, Copyright Guide, Suter Dep Ex. 8).**

32.     In placing the Ad Meter-submitted Super Bowl commercials in Presto, Jesse

Rindner, a USA Today producer, took a screenshot from the commercial to be used as a link to

view the commercial on line. (Rindner Dep. at 57:23-58:24; 69:8-13 – Exhibit L; Padavick Dep.

at 66:3-13 – Exhibit C; Gannett IG Resp., No. 16 – Exhibit B).

**RESPONSE: Controverted in part. Plaintiff does not dispute that Jesse Rindner downloaded the BTO Ad from YouTube and then took a high resolution screengrab from the commercial that comprised Plaintiff's copyrighted photograph. Rindner then uploaded the high resolution screengrab of Plaintiff's copyrighted photograph and the downloaded video into Presto and added tags including "USA TODAY" and "Ad Meter". Plaintiff controverts that the screenshot was taken "to be used as a link". Rindner testified the purpose of the screengrab was that it looked the best and told the best story. Ex. O, Rindner Dep., 45:10-16; 45:23-47:3; 52:1-52:22; 58:13-29; Ex. N, Suter Dep., 77:21-79:7; Ex. V, Screen shot, Rick Suter Dep. Ex. 3.**

33.     Rindner selected screenshots that would capture the theme of the commercial and provide viewers with an understanding of the commercial's content. (Gannett IG Resp., No. 16 – Exhibit B hereto; Rindner Dep. at 57:23-58:24; 69:8-13 – Exhibit L). Screenshots are used to provide a representation of the content of the linked video, and without a screen shot, "it would just be a black screen." (Rindner Dep. at 57:23-58:4 – Exhibit L).

**RESPONSE: Controverted in part and see general objections ¶¶ 2, 5. Plaintiff does not controvert Rindner gave the quoted testimony but see Plaintiff's response to ¶¶ 21, 32 as to Rindner's conduct and purpose.**

34.     Rindner added a title and summary to the screenshots she created to use as links for playing the Super Bowl commercials submitted to Ad Meter. (Rindner Dep. at 47:9-17; 50:4-51:6 – Exhibit L).

**RESPONSE: Controverted in part and see general objections. Plaintiff does not controvert Rindner downloaded the BTO commercial from YouTube and then took a high resolution screengrab from the commercial that comprised Plaintiff's copyrighted photograph. Rindner then uploaded the high resolution screengrab of Plaintiff's copyrighted photograph and the video into Presto and added tags including for "USA TODAY" and "Ad Meter" and changed the name of the creator to "jrindner@usatoday.com". Plaintiff controverts that the screenshot was taken "to be used as a link". Rindner testified the purpose of the screengrab was that it looked the best and told the best story. Ex. O, Rindner Dep. 44:3-46:10; Ex. N, Suter, 77:5-80:25; Ex. V, Screenshot, Rick Suter Dep. Ex. 3. In addition, see Plaintiff's response to ¶¶ 21, 32 as to Rindner's conduct and purpose.**

35.     In order to create the required screenshot link to view the BTO Ad in Presto, Rindner, took a screenshot of the Sowers Photo from within the BTO Ad (Rindner Dep. at 57:23-58:24; 69:8-13 – Exhibit L; Gannett IG Resp., No. 16 – Exhibit B; *see also* BTO Ad – Exhibit G). The screenshot of the Sowers Photo was limited to the BTO Ad. (Padavick Dep. at 72:2-73:9 – Exhibit C) (it's just in the system as the thumbnail for that video.").

**RESPONSE: Controverted in part and see general objections. Plaintiff does not deny that Rindner took a high resolution screen grab from within the downloaded video from YouTube of the Microsoft BTO commercial that comprised Plaintiff's copyrighted photograph. Plaintiffs deny that a screenshot link was required to view the BTO Ad in Presto. Plaintiff**

**also controverts that the screenshot was taken "to be used as a link". Rindner testified the purpose of the screengrab was that it looked the best and told the best story. (Ex. O, Rindner Dep. 44:3-46:10; Ex. V, Screenshot, Rick Suter Dep. Ex. 3). In addition, see Plaintiff's response to ¶¶ 21, 32 as to Rindner's conduct and purpose.**

36.     For the BTO AD, Rindner added the title "Ad Meter 2020: Microsoft" and a summary "Ad Meter 2020: Microsoft highlights Katie Sowers journey to the Super Bowl" to the Sowers Photo. (Rindner Dep. at 47:9-51:7 – Exhibit L).

**RESPONSE: Controverted in part and see general objections. Plaintiff does not controvert Rindner changed the title or added the quoted language to Plaintiff's Photo. Ms. Rindner also added "USA TODAY" and "Ad Meter" along with her name as the creator to Plaintiff's Photograph. See Plaintiff's response to Fact 32 as to Rindner's conduct and purpose. In addition, Plaintiffs deny the quoted language was a summary. (Ex. O, Rindner, 50:4-54:23; Ex. V, Screenshot, Rick Suter Dep. Ex. 3).**

37.     Copies of the screenshot of the Sowers Photo as it appeared on Defendants' web sites are submitted herewith as Exhibit M. Exemplar copies reproduced in Plaintiff's Complaint are set forth below:



(Complaint, Doc. No. 1, ¶ 92).



Complaint, Doc. No. 1, ¶ 161).

**RESPONSE: Controverted in part and see general objections. The reproduced exemplars are scaled down versions of the images in the complaint which Defendants' denied, at least in part. However, Plaintiff does not deny that images showing some of Defendants' use of Plaintiff's copyrighted photograph were provided as part of Plaintiff's complaint. (Dkt. 92).**

     38.    According to Robert Padavick, Director of Video and Special Events, Defendants believed they were permitted to use the screenshot of the Sowers Photo as a screenshot, testifying as Defendants' designated representative as follows:

> The basis for us, as with all the Ad Meter videos provided to us or specifically to this one, is that it was provided to us for inclusion in the Ad Meter program. It was provided with no noted -- no restrictions noted as to content within the ad. And therefore, as part of the publishing process of the video through Presto, it was an entirely reasonable decision on Ms. Rindner's part to select a screengrab from the video to represent that video. And a screengrab of the photo in question is a reasonable representation of the contents of that video.

(Padavick Dep. at 188:10-25 – Exhibit C).

**RESPONSE: Controverted in part and see general objections ¶¶ 2, 7. Plaintiff does not dispute the block quote of testimony was given by Mr. Padavick but controvert that Defendants believed they were permitted to use the Plaintiff's Photograph in the manner they chose to. Mr. Padavick testified that if Gannett was interested in publishing a video from YouTube, they would obtain permission to publish the video. Mr. Padavick also testified that the video was not provided to Gannett directly but that Gannett merely received a YouTube link. The Ad Meter videos were not submitted to USA Today. YouTube terms of service restricted Defendants from using YouTube to gain "access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except… with prior written permission from YouTube and, if**

applicable, the respective rights holders." Gannett has a Copyright Guide which is available for everyone at Gannett and states: "Taking a screenshot is copying and can result in a claim of copyright infringement." The Copyright Guide further states that "Almost every photo is protected by copyright." and states "To avoid copyright problems, use photos and videos that you already have the right to use. When in doubt, ask for permission from the copyright owner. The copyright owner is the person who created the material. You need to get permission from the copyright owner, meaning the photographer or videographer. A person who has a copy of the photo or who posts a photo online is not necessarily the copyright owner. Ask, did you take this photo?" and make sure they have the right to give you permission to use it. (Ex. E, YouTube License Agmt.; Ex. N, Suter, 77:5-80:25; Ex. H, Copyright Guide, Suter Dep. Ex. 8, Ex. C, Chart of Ownership, ; Ex. D, Padavick Depo. 56:2-21, 166:1-170:14, 174:2-14, 189:2-192:2; Ex. H, Copyright Guide, Suter Dep. Ex. 8).

39.     Rindner likewise believed she was permitted to use the screenshot of the Sowers Photo, testifying "to me there would be no reason why I wouldn't be able to take a screenshot from the video that I'm being given and using it." (Rindner Dep. at 41:23-42:1 – Exhibit L; *see also id.* at 95:19-25 ("I do think that there is a difference between taking a screenshot of a video that we were led to believe that we could use. And I feel like I kind of know that I couldn't just Google, you know, Tom Brady and take any picture off the Internet.")).

**RESPONSE: Controverted in part and see general objections ¶¶ 2, 7. Plaintiff does not dispute the block quote of testimony was given by Ms. Rindner but controvert that Defendants believed they were permitted to use the Plaintiff's Photograph in the manner they chose to. Ms. Rindner testified she never reached out to Plaintiff or attempted to get permission to use the photograph that she created the screenshot from. Ms. Rindner said that she did not remember if she had permission to use the video. Ms. Rindner didn't remember ever asking for permission to use a photograph the entire time she worked at Gannett. Ms. Rindner said that her job was to upload videos and that if she wasn't uploading videos she wasn't doing her job. Mr. Padavick also testified that the video was not provided to Gannett directly but that Gannett merely received a YouTube link. The Ad Meter videos were not submitted to USA Today. YouTube terms of service restricted Defendants from using YouTube to gain "access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except… with prior written permission from YouTube and, if applicable, the respective rights holders." Gannett has a Copyright Guide which is available for everyone at Gannett and states: "Taking a screenshot is copying and can result in a claim of copyright infringement." The Copyright Guide further states that "Almost every photo is protected by copyright." and states "To avoid copyright problems, use photos and videos that you already have the right to use. When in doubt, ask for permission from the copyright owner. The copyright owner is the person who created the material. You need to get permission from the copyright owner, meaning the photographer or videographer. A person who has a copy of**

the photo or who posts a photo online is not necessarily the copyright owner. Ask, did you take this photo?" and make sure they have the right to give you permission to use it. Ex. N, Suter, 77:5-80:25; Ex. H, Copyright Guide, Suter Dep. Ex. 8; Ex. C, Chart of Ownership; Ex. O, Rindner Dep. 96:16-97:20, 99:20-24; Ex. D, Padavick Dep. 56:2-21, 166:1-170:14, 174:2-14, 189:2-192:2.

40.    Defendants' use of the screenshot of the Sowers Photo was strictly as a link for playing the BTO Ad. (Campbell Dep. at 63:8-16 – Exhibit D) ("It is a fact that the photograph, the Sowers photograph, was used as a screen shot link to play the ad.").

**RESPONSE: Controverted in part and see general objections ¶ 5, 7. Plaintiff does not dispute that the quoted statement was provided by Defendants' counsel but controvert that Defendants' use of the screenshot of the Sowers Photo was "strictly as a link…" Rindner testified the purpose of the screengrab was that it looked the best and told the best story. The use of the photograph was as a prominent visual element promoting the Ad Meter videos and did not appear to be a "thumbnail" or "link" in that the entirety of Plaintiff's Photograph was visible the entire time. Defendants further used Plaintiff's Photograph to generate revenue. Moreover, Defendants' fail to cite Stephanie Campbell's testimony immediately following the quoted response, in which she made clear she didn't know what was meant by the term "linked". (Ex. O, Rindner Dep., 45:10-16; 45:23-47:3; 52:1-52:22; 58:13; Ex. Q, Campbell, 64:11-65:8, Ex. R, Campbell Dep. Sealed, 117:17-119:2; Ex. W, Deposition of Gerald Bybee, ("Bybee Dep."), 148:6—24). See also Plaintiff's Response to ¶¶ 21, 32 for Rindner's additional conduct related to the screengrab and purpose.**

41.    Plaintiff has never "seen an instance where the use of the [Sowers Photo] by ... any of the Gannett defendants was not used as a link for playing the ad." (Campbell Dep. at 65:14-20 – Exhibit D).

**RESPONSE: Controverted in part and see general objections. Plaintiff does not dispute the quoted testimony was given. However, Plaintiff testified that she did not click on the image with an arrow on it to see the BTO commercial. In addition, the photograph has been used by each of the Defendants to promote their publications and advertisers in their publications by displaying the photograph alongside advertising on each of Defendants' website. Plaintiff's photograph is also used directly on Presto without any arrow or as a link to the BTO commercial. (Ex. X Suter Depo. Ex. 7 pg. 13, Padavick Dep Ex. 14 and Ex. Y, Padavick Dep Ex 19, Ex. V, Suter Depo. Ex. 3 Screen shot, Dkt. 1; Ex. Q Campbell Dep. 45:10-46:15).**

42.    "[T]here was no other use of the image in any other context other than as an image representing the video in which it appeared." (Padavick Dep. at 195:10-13 – Exhibit C).

**RESPONSE: Controverted in part and see general objections ¶ 2. Plaintiff does not deny that Mr. Padavick gave the quoted testimony. However, Ms. Rindner testified that the**

purpose of obtaining the screengrab was for the way it looked and that Plaintiff's Photograph looked the best and told the best story. The use of the photograph was as a prominent visual element promoting the Ad Meter videos and did not appear to be a "thumbnail" in that the entire photograph was visible the entire time as a high-resolution image. Defendants also used the photograph to generate revenue. (Ex. O, Rindner, 45:10-16; 45:23-47:3; 52:1-52:22; 58:13; Ex. Q, Campbell Dep., 64:11-65:8, Ex. R, Campbell Dep. Sealed, 117:17-119:2; Ex. W, Bybee Dep., 148:6—24; Ex. X, Screen shot, Suter Dep. Ex. 7; Ex. Y, Photo, Padavick Dep. Ex. 19). See also Plaintiff's Response to ¶¶ 21, 32 for additional conduct and purpose related to the screengrab.

43.     In most cases, the Presto video player displays the screenshot image with a play button over it. (Padavick Dep. at 66:17-25 – Exhibit C).

**RESPONSE: Controverted and see general objections ¶ 7. Ms. Rindner testified that the she took the photograph from the Microsoft BTO commercial. Then uploaded it into Presto. When Ms. Rindner captured Plaintiff's photograph, it did not have the play button over the photograph. When Ms. Rindner uploaded the image into Presto, it didn't have the play button on it, as depicted in Presto, currently, it doesn't have the play button on it, and as depicted on Defendants' webpages, it doesn't have the play button on it. (Ex. V, Screen shot, Suter Dep. Ex. 3; Ex. Y, Photo, Padavick Dep. Ex. 19). See also Plaintiff's Response to ¶¶ 21, 32 for Rindner's additional conduct related to the screengrab.**

44.     Neither Rindner nor any Defendant was aware of any restriction involving the Sowers Photo in the BTO Ad. (Gannett IG Resp. No. 16 – Exhibit B; Padavick Dep at 158:5-25; 190:2-19 – Exhibit C).

**RESPONSE: Controverted and see general objections. Defendants were aware of restrictions involving the photograph. By obtaining the video from YouTube, Defendants were subject to YouTube terms of service which restricted Defendants from using YouTube to gain "access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except… with prior written permission from YouTube and, if applicable, the respective rights holders;" Additionally, Mr. Padavick, acknowledged that Gannett has a Copyright Guide which is available for everyone at Gannett and states "Taking a screenshot is copying and can result in a claim of copyright infringement." The Copyright Guide further states that "Almost every photo is protected by copyright." and states "To avoid copyright problems, use photos and videos that you already have the right to use. When in doubt, ask for permission from the copyright owner. The copyright owner is the person who created the material. You need to get permission from the copyright owner, meaning the photographer or videographer. A person who has a copy of the photo or who posts a photo online is not necessarily the copyright owner. Ask, did you take this photo?" and make sure they have the right to give you permission to use it. (Ex. N, Suter, 77:5-80:25; Ex. H, Copyright Guide, Rick Suter Dep.**

**Ex. 8, Ex. C, Chart of Ownership; Ex. D, Padavick Dep. 56:2-21, 166:1-170:14, 174:2-14, 189:2-192:2).**

45.     Ad Meter content, including the submitted Super Bowl commercials and the BTO

Ad containing the screenshot of the Sowers Photo, was available to the Gannett Publication

Defendants' websites through Gannett's Presto content management system. (Gannett IG. Resp.

Nos. 16-17 – Exhibit B).

**RESPONSE: Controverted in part and see general objections. Ad Meter did not use the high resolution screen grab of Plaintiff's Photograph. Mr. Suter testified that "the only Ad Meter campaign would have been the one I was overseeing on the–on the Ad Meter Platform…on Admeter.USAToday.com." On Ad Meter, Defendants used the BTO commercial and photographs provided to Mr. Suter by an agency working with Microsoft, none of which were images of Plaintiff's Photograph. Plaintiff's Photograph was not used on Ad Meter but was put on Presto with altered Copyright management information. (Ex. D, Padavick Dep., 45:5-21, 81:19-83:8, 108:7-13; Ex. N, Suter Dep., 77:5-80:25). See also Plaintiff's response to ¶¶ 31, 32, 34, 36.**

46.     When the 2020 Super Bowl Ad Meter-submitted commercials went "live" via Presto,

they could then be linked to appear on the Gannett Publication Defendants' websites and, conversely,

when a commercial was unpublished on Presto, the link went "dead" and was no longer be visible on

any site to which it had been linked. (Gannett IG. Resp. Nos. 16-17 – Exhibit B).

**RESPONSE: Controverted in part and see general objections. Initially, Ad Meter content was not used on Presto. Ms. Rindner created her own content to be used on Presto. Ad Meter used links from YouTube for their Super Bowl commercials. After receiving a YouTube link for the BTO commercial, Mrs. Rindner testified that downloaded the BTO commercial and then uploaded that content into Presto. Each publication was responsible for its own content and they managed their own websites and content. Additionally, while Gannett appears to have "unpublished" Plaintiff's Photograph, it is still live on Presto and visible via the Presto website. (Ex. O, Rindner Dep. 44:3 - 47:17; Ex. D, Padavick Dep, 108:7-13, 112:2-114:2, 119:12-122:9, 178:3-180:6; Ex. Y, Photo, Padavick Depo. Ex. 19).**

47.     The BTO Ad, including the screenshot of the Sowers Photo, was available to and

used on Defendants websites in conjunction with 61 other Super Bowl commercials submitted to

Ad Meter. (Gannett IG. Resp. Nos. 16-17 – Exhibit B).

**RESPONSE: Controverted in part as to "in conjunction with…" and see general objections. Plaintiff's Photograph was uploaded into Presto as a singular "asset" and the photograph was used on each publishing Defendants' publication for an individual webpage where the photograph was the central visual element on the page. (Ex. X, Screenshot, Suter Dep. Ex. 7; Ex. V, Screen shot, Suter Dep. Exh 3; Ex. Y, Padavick Dep. Ex. 19).**

48.     The BTO Ad placed ninth out of the 62 commercials that were submitted. (Gannett IG. Resp. Nos. 16-17 – Exhibit B).

**RESPONSE: Uncontroverted for purposes of summary judgment but see general objections.**

49.     Exhibit N hereto (Gannett_campbell_000227-52) is a depiction of the complete line-up of screenshots for the 2020 Super Bowl commercials in Ad Meter as included within Presto, without the Sowers Photo screenshot, which was removed following Plaintiff's notice of alleged infringement. (Gannett_campbell_000238 – Exhibit N; Gannett IG Resp. No. 11 – Exhibit B).

**RESPONSE: Controverted and see general objections. Plaintiff further objects that Defendants do not accurately describe Exhibit N or that its description in ¶ 49 is misleading. Exhibit N reflects Commercial Appeal's use of one article related to the Super Bowl which appeared on one publication. Exhibit N is not a complete depiction of all screenshots reflecting Defendants' coverage of the 2020 Super Bowl. In addition, Exhibit N omits all depictions of Defendants' use of Plaintiff's image, which is the subject of the lawsuit. Additionally, the Ad Meter content was not used on Presto. Defendants created separate content for Presto which was not from Ad Meter. The only Ad Meter program was the Ad Meter program Mr. Suter oversaw and that Ad Meter program used links from YouTube and photographs other than Plaintiff's Photograph which were provided to Mr. Suter. (Ex. K, Ex. V, Ex. X and Ex. Y reflecting a portion of the websites which used Plaintiff's photograph. See also Ex. N, Suter Depo, 44:22-45:21, 81:19-83:8, ; Ex. D, Padavick 108:7-13)**

50.     Defendants cannot determine the exact dates the screenshot of the Sowers Photo appeared on the Gannett Publication Defendants' websites. However, it was, at most, the period of January 28, 2020 until receipt of Plaintiff's claim of infringement on or about January 20, 2021. It is also possible the screenshot of the Sowers Photo appeared for a shorter period of time on some of the Defendant websites. (Gannett IG Resp. No. 11 – Exhibit B).

**RESPONSE: Controverted in part and see general objections ¶¶ 2, 7, 8. Plaintiff does not dispute that Defendants' infringing conduct includes the dates provided but contradicts any limitation on additional dates contained in Defendants' compound, self-contradictory, speculative, and self-serving ¶ 50. However, Defendants did not investigate if any of the websites using Plaintiff's photograph appeared on Defendant's website. (See Ex. P, Wolfe 29:12-31:14, 222:16-19).**

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

## BACKGROUND

1.      On August 11th 2017, at the football game between the Chiefs and the 49ers, Plaintiff captured an iconic photograph of Katie Sowers after she had just been hired as only the second female and the first openly LGBT coach in the NFL using a high resolution professional DSLR camera with a Canon 300mm f/2.8 USM telephoto lens, deliberately compressing planes and focusing narrowly and precisely on Ms. Sower's intense facial expression, body language and involvement in the game ("Plaintiff's Photograph"). (Ex. A, Bybee Report p 12-13).

## DEFENDANTS

2.      Defendant Gannett Company, Inc. ("Gannett") is a large sophisticated publicly traded company that has been sued for copyright infringement many times before and is accustomed to negotiating and obtaining licensed use of photographic images and aware of the consequences for failing to do so. (Answer 53; Ex. D, Padavick, 26:13-27:7; Ex. P, Deposition of Tim Wolfe, 78:12-79:4; Ex. M, Annual Report, Wolfe Depo Ex. 23; Ex. H, Copyright Guide; Ex. G, Pacer Report).

3.      Gannett does not own the other Defendants, at least fifteen (15) of which are separate, sophisticated legal entities and media companies accustomed to negotiating and obtaining licenses for use of photographic images or the consequences for failing to do so. (See, e.g., Ex. T, Defendant Gannett Satellite Information Network, LLC's Answers to Interrogatories

2, 3 & 4; Ex. C, Chart of Ownership; Ex. S, Defendant Gannett Co., Inc.'s Answer to Interrogatory

2; see, e.g., Dkt. 28, Answer at ¶ 132).

4.     Gannett has a Copyright Guide which is made available for everyone at Gannett

and for Defendants which provides that:

a)  "Taking a screenshot is copying and can result in a claim of copyright
infringement."

b)  "Almost every photo is protected by copyright."

c)  "To avoid copyright problems, use photos and videos that you already have the
right to use. When in doubt, ask for permission from the copyright owner. The
copyright owner is the person who created the material. You need to get permission
from the copyright owner, meaning the photographer or videographer. A person
who has a copy of the photo or who posts a photo online is not necessarily the
copyright owner. Ask, did you take this photo?" and make sure they have the right
to give you permission to use it.

d)  "Under federal law, the only person who is permitted to copy a photo, video, music
or writing without permission is the person who originally created it."

(Ex. H, Copyright Guide, Suter, Depo. Ex. 8; Ex. C, Chart of Ownership; Ex. D, Padavick Dep.,

52:23-53:21; Ex. H).

**THE C&R LICENSE**

5.     Plaintiff entered into a contract with Catch&Release ("C&R") for use of her

photograph as a part of a Super Bowl ad for Microsoft ("the BTO commercial"), which Plaintiff

understood to cover a one-time use of Plaintiff's photograph ("the C&R License"). (Ex. Q,

Campbell Dep., 18:23-19:6; Ex. R, Campbell Dep Sealed, 68:7-72:2; Ex. A, Bybee Rpt, pg. 14;

Ex. J, License Agreement).

6.     While maintaining ownership of her Photograph, Plaintiff granted only C&R the

right to reproduce, modify, distribute or display Plaintiff's original content pursuant to the express

terms of the C&R License. (Ex. I, Affidavit of Stephanie Campbell ("Campbell Aff."), ¶2; Ex. J, License Agreement).

7.      Per the C&R License's express terms, Plaintiff prohibited any further sublicensing of any rights related to her photograph by C&R to anyone other than a single sublicensee: Microsoft Corporation. (Ex. W, Bybee Dep., 133:8-134:25; Ex. J, License Agreement).

8.      Neither any Defendant, nor any other non-party entity besides C&R (as limited licensee) and Microsoft Corporation (as a limited sublicensee) are identified or anticipated by the C&R License as having any rights related to Plaintiff's Photograph. (Ex. W, Bybee Dep. 133:8-134:25; Ex. J, License Agreement).

**GANNETT'S RECEIPT OF PLAINTIFF'S PHOTOGRAPH**

9.      On January 28, 2020, a representative of non-party Waggener Edstrom Worldwide, Inc. ("WE") sent an email to Gannett and provided a link to a YouTube video of the BTO commercial along with high resolution screenshots from the BTO commercial for use by Gannett on Ad Meter, pursuant to the Ad Meter Submission Guidelines. (Ex. D, Padavick, 165:3-174:14; Ex. F, Jan 2020 Email, Padavick Depo. Ex. 17; Ex. CC, 2020 Ad Meter Guidelines, Padavick Dep. Ex. 18).

10.     None of the high resolution photographs attached to the email from WE were of Plaintiff's Photograph. (Ex. D, Padavick 178:3-19; Ex. N, Suter Dep., 45: - ; 94:5-23).

11.     Plaintiff has never had contact with WE. (Ex. I, Campbell Aff., ¶3).

12.     The BTO commercial on YouTube contained Copyright management information, including name ("Microsoft") and title ("Microsoft – Be The One (2020) Super Bowl with Katie Sowers"). (Ex. I, Campbell Aff., ¶4).

xxx

13.     WE's email to Gannett does not state WE was acting on behalf of Microsoft, C&R, or Plaintiff nor does it purport to license or transfer any rights of Microsoft, C&R, or Plaintiff. (Ex. D, Padavick 165:3-24; Ex. F. Jan 2020 Email, Padavick Dep Ex. 17).

14.     At the time WE emailed Gannett, Gannett did not know about the C&R license agreement. (*See, e.g.*, Ex. S, Defendant Gannett Co., Inc.'s Answer to Interrogatory No. 16; Ex. JJ, Aug 2021 Emails, IPG_000001-000005).

**GANNETT'S INFRINGEMENT**

15.     After receiving WE's YouTube link, Gannett downloaded the video of the BTO commercial. (Ex. D, Padavick Dep., 166:2-171:15, Ex. O, Rindner Dep., 38:2-9, 45:23-46:10, 82:11-83:24; Ex. F. Jan 2020 Email, Padavick Dep Ex. 17).

16.     Instead of using the photographs provided by McCann, Gannett chose to electronically duplicate Plaintiff's Photograph by taking a high resolution screen grab constituting an identical copy of Plaintiff's Photograph from the 41 second mark of the downloaded BTO Commercial. (Ex. D, Padavick Dep. 70:12-19, 170:25-172:24; Ex. O, Rindner, 82:1-83:18; Ex. U Moran Depo.), 20:14-21:2; Ex. N, Suter, 64:2-20; Ex. Y, Photo, Padavick Depo. Ex. 19).

17.     Gannett took the screen grab of Plaintiff's Photograph because it "looked the best" and because of the story it told. (Ex. O, Rindner, 57:9-59:16; Ex. D, Padavick, 68:12 – 69:13, 181:7-185:5).

18.     At no time prior to or after taking the screen grab of Plaintiff's Photograph did Gannet attempt to obtain Plaintiff's permission to use Plaintiff's Photograph and Plaintiff has never given permission to Gannett or any other party or non-party to take a screen shot of Plaintiff's Photograph. (Ex. I, Campbell Aff., ¶¶5-6; Ex. O, Rindner, 99:20-24; Ex. D, Padavick, 158:6-11; 160:16-161:7).

19.    At no time prior to taking the screen grab did anyone affiliated with Defendants seek the requisite permission to use Plaintiff's Photograph from Microsoft or C&R, nor did Defendants seek the requisite determination from a manager or Gannett's legal department that the proposed use of Plaintiff's Photograph would qualify as fair use. (Ex. O, Rindner, 42:3-15; Ex. D, Padavick 52:23-53:21, 161:16-162:7, 189:2-192:23; Ex. H, Gannett Copyright Guide, p 6, Suter Dep Ex. 8).

20.    Gannett altered and removed Copyright management information that existed on the YouTube BTO Commercial that it placed on Presto, including adding "Ad Meter 2020" to the name, inserting "USA TODAY", and adding a copyright notice and terms of use, without seeking or obtaining permission from Microsoft, C&R, or Plaintiff . (Ex. O, Rindner, 45:10-46:19, 47:15-49:6, 50:4-14, 50:23-55:22).

21.    Gannett derives revenue from the Ad Meter Platform, which included its own advertisement and sponsorship revenue. (Ex. N, Suter, 21:5-22:7, 25:14-18; Ex. U, Moran 23:9-29:2, 72:12-20).

22.    After taking the screen grab of Plaintiff's Photograph, Gannett added Copyright Management information to Plaintiff's Photograph, including that its author was "jrinder@usatoday" and that USA Today was the source of the image before placing a copy of Plaintiff's Photograph on Defendants' Presto platform. (Ex. V, Screen shot, Suter Depo. Ex. 3; Ex. O, Rindner, 45:10-46:19, 47:15-49:6, 50:4-14, 50:23-55:22, 89:21-93:24).

23.    Gannett did not use the high-resolution screen grab on Ad Meter. (Ex. N, Suter, 44:22-45:21; Ex. D, Padavick 108:7-13).

24.    Presto is used by Gannett to share content across the local and national markets. (Ex. P, Wolfe, 67:3-9; Ex. V, Screen shot, Suter Depo. Ex. 3).

25.     After Gannett placed the duplicated copy of Plaintiff's Photograph into Presto, the duplicated image was transmitted to each of the Defendant publications where it was used by each Defendant publication on a webpage associated with the Defendant publication. (Ex. O, Rindner, 90:11-93:24; Ex. V, Screen shot, Suter Depo. Ex. 3; Ex. X, Screen Shot, Suter Dep. Ex. 7;).

26.     Each Defendant publication's webpage displaying Plaintiff's Photograph identified USA TODAY as the source of the Photograph and included a copyright notice, with a © the year and a publication name other than Plaintiff (i.e. "© 2020 www.courier-journal.com), and confirming that the publication had "All Rights Reserved". (Dkt. 28; Ex. O, Rindner, 45:10-46:19, 47:15-49:6, 50:4-14, 50:23-55:22, 89:21-93:24; Ex. V, Screen shot, Suter Dep Ex. 3).

27.     All of Defendants' webpages with Plaintiff's Photograph include advertising and a "subscribe now" feature and Gannett received revenue based on the number of impressions for all ads on websites that included Plaintiff's Photograph. (Ex. D. Padavick Dep. 112:7 – 117:20; Ex. BB, Milwaukee Journal Screen shot, Padavick Dep. Ex. 14; Ex. P Wolfe Dep., 93:18-21; 115:18-118:1; 126:19-127:11; Ex. N, Suter Dep., 10:21-14:20).

28.     Each publishing Defendant used Plaintiff's Photograph as the single dominant image on a webpage at the center of the screen. (Ex. D, Padavick Dep, 80:17-25; 89:9-14; 112:7-118:7; Bybee Supp. Report, 3-4).

29.     Each publishing Defendant used Plaintiff's Photograph with removed and altered Copyright management information. (Ex. O, Rindner Dep. 44:3-46:19, 47:15-49:6, 50:4-14, 50:23-55:22;89:21-93:24; Ex. V, Screen shot, Suter Dep. Ex. 3).

30.     Each publishing Defendant's website included Website Terms of Service that provided:

This site and all the materials available on the Site are the property of us and/or our affiliates or licensors, and are protected by copyright, trademark, and other intellectual property laws.

You may, however, from time to time, download and/or print one copy of individual pages of the Site for your personal, non-commercial use, provided that you keep intact all copyright and other proprietary notices. For information about requesting permission to reproduce or distribute materials from the Site, please contact us.

("Terms of Service" are contained in Exhibit EE, bottom of pg. 27, RS Depo Ex. 1; Ex. S, Defendant Gannett Co. Inc.'s Answers to Interrogatories).

31.     Gannett and the other seventeen defendants used Plaintiff's photograph from January 29, 2020 until January 21, 2021 (See, e.g., Ex. S, Defendant Gannett Co., Inc.'s Answer to Interrogatory 11; Ex. FF, Phoenix Newspapers, Inc.'s Answer to Interrogatory 7).

32.     Plaintiff first became aware of Defendants' use of Plaintiff's Photograph sometime shortly before sending a cease and desist letter advising that their use was in violation of her intellectual property rights, in January of 2021. (Ex. Q, Campbell, 47:3-22; Ex. F, Jan 2020 Email, Padavick Dep. Ex. 17; Ex. L, Letter to McCann; Ex. K, Cease and Desist Letters).

**THE PUBLISHING DEFENDANTS**

33.     Each publication Defendant separately determines which content it received from Gannett to use for its websites, its advertisers and in its publications and had its own editor responsible for keeping its site up to date, curating it, programming and promoting certain content at their discretion. (Ex. D, Padavick Dep., 93:24-94:25, 136:5-24; Dkt. 28, Answer ¶¶84, 117,151, etc.)

34.     Without charge, each Defendant would have received the Presto content and could select to use it by publishing it on their own webpage, whereby it would be accessible to the public. (Ex. D, Padavick Dep., 87:3 – 88:4, 105:17-25; Dkt. 28, Answer ¶¶85, 118, 152, etc.).

35.     Each publishing Defendant's website had a copyright notice with a ©, the year and the publication url and the statement "All Rights Reserved". (Dkt. 28, Answer ¶¶86, 119, 153 etc.).

36.     Each publishing Defendant derives revenue from content it publishes. (Dkt. 28, Answer ¶¶90, 123, 159, etc.).

## DAMAGES

37.     Defendants' unauthorized copying, reproduction, distribution and display of Plaintiffs' Photograph interfered with Plaintiff's actual and prospective relationships with clients who might otherwise compensate Plaintiff for the licensed use of the Plaintiff's Photograph. (Ex. W, Bybee 105:5-107:21; Ex. A, Bybee Report, p. 16).

38.     Defendants use also prevented or limited Plaintiff from granting any broadly exclusive license in Plaintiff's Photograph to other third parties. (Ex. W, Bybee Dep., 138:6-20, Ex. A, Bybee Report, p. 16).

39.     Defendants' use of Plaintiff's Photograph contributed to the generation of advertising and subscriber revenue. (Ex. U, Moran Dep., 46:17-48:4; Ex. B, Supp. Bybee Report, p. 4).

40.     James Harrington, CPA's expert opinions are based on his analysis of Defendants financial documents produced during discovery, wherein he identified Defendants revenue sources corresponding to alleged infringing activities (namely advertising and subscriber revenue from webpages containing Plaintiff's Photograph), removed irrelevant revenue streams from his analysis, limited his analysis by time period, limited his analysis by subject matter, and further limited his analysis to Defendants. (Ex. GG, Deposition of James Harrington ("Harrington Dep."), 25:10-23; Ex. Z, Harrington Report; Ex. AA, Harrington Supplemental Report; Ex. II, Affidavit of James Harrington ("Harrington Aff.")¶¶3-7).

41. The publishing Defendants' websites did not appear to be simply commentary or critique of the commercials, or of the photographs. (Ex. A, Bybee Report, p. 16; Ex. HH, Affidavit of Gerald Bybee ("ByBee Aff.") ¶3).

42. Encouraging viewers to click on a Subscribe Now feature contributes to one of the five key pillars to Gannett's growth strategy. Ex. M, Annual Rpt, Wolfe Dep. Ex. 23, pg. 2, Ex. P, Wolfe Dep. 68:1-70:1

43. Presto, Gannett's content library, contributes to Gannett's subscription led business strategy. Ex. P, Wolfe Dep. 67:10-68:20, Ex. M, Annual Rpt, Wolfe Dep. Ex. 23, pg. 2

44. Defendants' subscriber revenue grew nearly 50% during the time period Plaintiff's photograph was on Defendants' websites with the Subscribe Now feature. When a user clicked Subscribe Now, it contributed to Gannett's record growth. Ex. P, Wolfe Dep 73:6-75:16, 99:2-18, Ex. M, Annual Rpt, Wolfe Dep. Ex. 23, pg. 3.

45. The use of Plaintiff's entire image as a primary element in high resolution was to attract views, clicks and revenue. Because Defendants' are paid for every impression, every view and click is a user on a page which represents revenue to Defendants. Exh W, Bybee Deposition 153:19-157:8, Ex. A, Bybee Report; Ex. B, Bybee Supp. Report; Ex. HH, Bybee Aff ¶4.

## INTRODUCTION

Defendants, sophisticated media companies, familiar with the copyright laws reproduced Plaintiff's photograph without permission because it was the best image. After Defendant's reproduced the image, it was then placed within Defendant's content library where each of the other Defendants obtained it and used it on each of their websites. Each of Defendants' websites earn revenue from advertising and digital subscribers. Plaintiff's experts have opined as to the damage to Plaintiff and the revenue which Defendants received as a result of their infringement, limited to the websites which used plaintiff image, limited to the streams of revenue which each publication defendant earns from their website, limited to the duration of the infringement. Through deposition testimony, documents and expert witness reports, Plaintiff has shown the requisite nexus between Defendants' infringement and ad revenues and subscription revenue from the offending websites. Through their motion, Defendants do not deny they earned revenue, but instead claim that Plaintiff's failed to meet their burden of showing the required nexus. However, Plaintiff's met its burden and Defendants' motion should be denied.

## ARGUMENT & AUTHORITY

### I.     APPLICABLE STANDARD.

Summary judgment is only appropriate if, based upon the pleadings, admissions, depositions and affidavits, there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.56(c); *Celotex Corporation v. Catrett,* 477 U.S. 317, 322 (1986). The moving party bears the burden of showing the absence of a material issue of fact for trial. *Celotex,* 477 U.S. at 323. Any doubt as to the existence of a material fact must be resolved in favor of the party opposing the motion. *Id.* In ruling on a motion for summary

1

judgment, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999).

## II. SUMMARY JUDGMENT ON DISGORGEMENT OF PROFITS IS INAPPROPRIATE.

17 U.S.C. § 504 imposes two categories of compensatory damages on infringers. § 504 provides for the recovery of both the infringer's profits and the copyright owner's "actual damages." These two categories have different justifications and are based on different sets of financial data. The award of profits looks at it from the infringer's point of view. If the infringer has earned a profit, they must disgorge the profit to ensure that they not benefit from their wrongdoing. The award of the actual damages looks at it from the copyright owner's perspective and compensates the copyright owner for any harm suffered by reason of the infringer's illegal act. *On Davis v. The Gap, Inc*., 246 F.3d 152, 159 (2d Cir. 2001), as amended (May 15, 2001); *Fitzgerald Publ'g Co. v. Baylor Publ'g Co*., 807 F.2d 1110, 1118 (2d Cir.1986); *Walker v. Forbes, Inc*., 28 F.3d 409, 412 (4th Cir.1994). The statute does not define the term "actual damages," nor does it prescribe a method for calculating such damages. Generally, the term "actual damages" is "broadly construed to favor victims of infringement." *On Davis v. The Gap, Inc*., 246 F.3d 152, 164 (2d Cir.2001) (collecting cases and commentaries).

### a. PROOF THAT REVENUE WAS LIMITED TO INFRINGING ACTS SATISFIES BURDEN

Critically, "[i]n establishing the infringer's profits, **the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."** *Infogroup, Inc. v. DatabaseLLC,* 956 F.3d 1063, 1068 (8th Cir. 2020) (quoting § 504(b) (emphasis added)). "Although cases distinguish between direct and indirect profits, the statute does not." *Andreas v. Volkswagen of American, Inc.*, 336 F.3d 789, 796 (8th

2

Cir.2003) (citing *Mackie v. Rieser,* 296 F.3d 909, 914 (9th Cir.2002) ("On its face, § 504(b) does not differentiate between 'direct profits' ... and 'indirect profits' ...."), *cert. denied,* 537 U.S. 1189, 123 S.Ct. 1259, 154 L.Ed.2d 1022 (2003). "[T]he plaintiff has the 'burden' to demonstrate a nexus between the infringement and the indirect profits before apportionment can occur." *Mackie,* 296 F.3d at 915 (citing *Univ. of Colo. Found. v. Am. Cyanamid Co.,* 196 F.3d 1366, 1375 (Fed.Cir.1999), *cert. denied,* 529 U.S. 1130, 120 S.Ct. 2005, 146 L.Ed.2d 956 (2000)).

Establishing a causal nexus does not require the plaintiff "to put a ... buyer on the stand to testify that she bought" the product at issue specifically because of the infringement. *Wood v. Houghton Mifflin Harcourt Pub. Co.*, 589 F. Supp. 2d 1230, 1245 (D. Colo. 2008) (citing *Andreas*, 336 F.3d at 797). The required nexus is established by demonstrating that "the profits at issue are not generated by outside sources, but by money collected from the use of the specific infringed work," *Id* (*Bonner*, 404 F.3d at 293). Furthermore, the Supreme Court has held that "an infringer who commingles infringing and noninfringing elements 'must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him.' " *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 567, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (quoting *Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 406, 60 S.Ct. 681, 84 L.Ed. 825 (1940)).

### b. SINCE PLAINTIFF'S MET THEIR BURDEN, DEFENDANTS HAD TO APPORTION THE PROFITS

"Once that nexus is established in either a direct or indirect profits case, if 'an infringer's profits are attributable to factors in addition to use of plaintiff's work, an apportionment of profits is proper. The burden of proving apportionment (i.e., the contribution to profits of elements other than the infringed property), is the defendant's.'" *Andreas*, 336 F.3d at 796, quoting *Frank Music I,* 772 F.2d at 518 (internal citations omitted) (holding that infringing use of music in one of ten

3

acts of Las Vegas casino musical revue entitled copyright holder to portion of casino's hotel and gaming operations based on revue's promotional nature). Thus, "where some of the defendant's profits result from the infringement and other profits are caused by different factors, ... the burden of proof is on the defendant ... [to] prove not only 'his or her deductible expenses' but also 'the element of the profit attributable to factors other than the copyrighted work.'" *Id.* "

"[I]n an indirect profits case the profits "attributable" to the infringement are more difficult to quantify. But that difficulty does not change the burden of proof established by the statute. The burden of establishing that profits are attributable to the infringed work often gets confused with the burden of apportioning profits between various factors contributing to the profits." *Andreas*, a 796. "Any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff. If the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits." *Andreas*, 336 F.3d at 797, quoting, *Frank Music Corp. v. Metro–Goldwyn– Mayer, Inc.,* 772 F.2d 505, 514 (9th Cir.1985)). Moreover, "[t]he question of allocating an infringer's profits between the infringement and other factors, for which the defendant infringer carries the burden, is **"highly fact-specific,"** *Estate of Vane v. The Fair, Inc.,* 849 F.2d 186, 190 (5th Cir.1988), *cert. denied,* 488 U.S. 1008, 109 S.Ct. 792, 102 L.Ed.2d 783 (1989)", and should generally be left to the jury." *Andreas*, 336 F.3d at 797, (citing *Frank Music Corp. v. Metro– Goldwyn–Mayer Inc.,* 886 F.2d 1545, 1550 & n. 4 (9th Cir.1989) ( *Frank Music II* ) (upholding award of nearly $700,000 of infringer's indirect profits in appeal from remand of *Frank I* based on district court's finding that 2% of MGM's indirect profits were attributable to infringement), *cert. denied,* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990). Simply establishing that some revenue was likely generated by factors other than the wrongful use of the copyrighted material is insufficient to satisfy the Defendants' burden:

"Audi argues that numerous unknown elements other than the commercial, let alone the infringing words contained in the commercial, contributed to sales of the TT coupe, and that therefore the award was based on speculation. We recognize that the offending commercial probably did not contribute to every purchase of a TT coupe during the relevant time period. Undoubtedly, some buyer somewhere bought a TT coupe without having seen the commercial despite Audi's extensive use of it. But we reject the notion that Andreas was required to put a TT buyer on the stand to testify that she bought the car because of the commercial in order to meet his burden of a causal connection. Once a nexus was shown as established above, Andreas was required under the statute only to establish Audi's gross revenue from the TT coupe. Audi then bore the burden of establishing that its profit was attributable to factors other than the infringing words: the other two commercials that did not contain the infringed words, other parts of the Wake Up commercial, customer loyalty, brand recognition, etc."

*Andreas*, 336 F.3d at 797.

Plaintiff has established a nexus between the acts of infringement and the revenue of Defendant. *See Mackie v. Rieser*, 296 F.3d 909, 911 (9th Cir. 2002) ("In consonance with our holding in *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505 (9th Cir.1985), and subsequent rulings from several of our sister circuits, we hold that to survive summary judgment, a copyright infringement plaintiff seeking to recover indirect profits damages under 17 U.S.C. § 504(b) must proffer some evidence to create a triable issue regarding whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement.") Using documentary evidence, deposition testimony and expert reports, Plaintiff has established the required nexus, the causal link between the infringement and Defendant's profit stream related to its infringement.

### c. DOCUMENTARY EVIDENCE SUPPORTS NEXUS

Initially, Plaintiff identified all sources or revenue for the Defendants. (SOAF ¶ 40). Specifically, Plaintiff's damages expert, Mr. James Harrington, a Certified Public Accountant with almost thirty years of accounting and financial analysis experience, combed through the financial information provided by Defendants and identified the revenue sources which corresponded to

Defendants' infringing activities, namely its revenue, from advertising on webpages containing Plaintiff's photograph and subscriber revenue related to the Subscribe Now feature on the websites featuring Plaintiff's photograph. (SOAF ¶ 40) After establishing all sources of revenue, Plaintiff then determined which streams of revenue were related to the infringement. Specially, which sources of revenue were related to Defendants' use of Plaintiff's Photograph. (SOAF ¶ 40) After determining that the only sources of Plaintiff's revenue related to the infringement were revenue streams from the Defendants' websites, Plaintiff's expert limited their calculations to the digital and online revenue. (SOAF ¶40) After Defendants' expert provided additional information and based on additional deposition testimony, Plaintiff's expert again revised his report. (SOAF ¶ 40) In the revised report, Plaintiff's expert removed revenue from consideration and recalculated the revenue based on the additional information, to further limit the revenue to streams only related to the infringement / revenue for the websites which unlawfully displayed a reproduction of Plaintiff's photograph. (SOAF ¶ 40).

Every webpage which included Plaintiff's photograph included advertisements and a Subscribe Now button for which Defendant's received revenue. (SOAF ¶ 27) Gannett admitted that all of the webpages with Plaintiff's photograph included advertising and a Subscribe Now feature. (SOAF ¶ 27) Gannett admitted that it received revenue for the advertisements placed on the webpages which included Plaintiff's photograph. (SOAF ¶ 27) Encouraging viewers to click on the Subscribe Now features contributes to one of the 5 key pillars to Gannett's growth strategy. (SOAF ¶¶ 42) The execution of Defendant's subscription-led business strategy includes use of Presto, Defendant's content library which was used to store and transmit Plaintiff's photograph to each Defendant Publication. (SOAF ¶ 43) Each of Defendants' websites displayed Plaintiff's Photograph with advertisements that paid based on the number of impressions. (SOAF ¶ 27) As

a result of being paid for each viewer of each advertisement for each Defendant for the entire year Plaintiff's photograph was displayed, Defendant received revenue for displaying Plaintiff's photograph. (SOAF ¶ 27) In addition, during the year that Plaintiff's photograph was displayed, Defendant's subscription revenue grew by fifty-percent (50%). (SOAF ¶ 44) When a viewer of Plaintiff's photograph clicked the Subscribe Now feature, it contributed to Gannett's record growth (SOAF ¶ 44). There was a direct link between the people who viewed the infringing Photograph and Defendants' revenue.

Gannett also admitted that it received revenue for the Subscribe Now feature placed on the webpages which included Plaintiff's photograph. (SOAF ¶44). The use of Plaintiff's image as the primary element on Defendants' website was to attract eyes, clicks and revenue. Every click is a user on the page which represents money in the pocket for Defendants. (SOAF ¶ 45). Thus, substantial evidence has been presented that as a "direct result of the aesthetic and visual appeal of the Campbell photograph, its prominent placement within the primary home pages and various secondary web site pages …, the Campbell image contributed to the generation of advertising and new subscription revenues received by Gannett and each of the Defendants during the period of its unlicensed use and publication." (SOAF ¶ 45).

Through deposition testimony and expert reports, Plaintiff has shown that Gannett used Plaintiff's image in connection with its revenue generating services and received revenue from the advertisements and Subscribe Now feature where Plaintiff's photograph was the central and primary feature. In fact, driving digital subscriber growth was one of the key pillars of Gannett growth strategy, which was accomplished in part based on the use of Plaintiff's photograph with a Subscribe Now feature. (SOAF ¶¶ 42, 43, 45).

Plaintiff's Expert Preformed Proper Analysis

Plaintiff has presented standard and reliable proof that the Defendants received revenue related to their infringement of Plaintiff's photograph, which was limited to the duration of the infringement, limited to the Defendants conduct and removed eliminated sources of the business revenue unrelated to the Defendants infringement. *On Davis*, 246 F.3d 159-160. By limiting the calculation of damages to streams of revenue only related to Defendant's infringement, Plaintiff has established the nexus required under 17 USC §504(b). *On Davis v. the Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001). In *Davis*, the court stated that:

> "[I]f a publisher published an anthology of poetry which contained a poem covered by the plaintiff's copyright, we do not think the plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue resulting from its publication of hundreds of titles, including trade books, textbooks, cookbooks, etc. In our view, the owner's burden would require evidence of the revenues from the sale of the anthology containing the infringing poem. The publisher would then bear the burden of proving its costs attributable to the anthology and the extent to which its profits from the sale of the anthology were attributable to factors other than the infringing poem, including particularly the other poems contained in the volume...."

*Davis*, 246 F.3d at 160.

Contrary to Defendant's claims, establishing a causal nexus does not require plaintiff "to put a ... buyer on the stand to testify that she bought" the product at issue specifically because of the infringement. *Wood v. Houghton Mifflin Harcourt Pub. Co.*, 589 F. Supp. 2d 1230, 1245 (D. Colo. 2008) citing *Andreas*, 336 F.3d at 797. Plaintiff has established that the profits at issue are not generated by outside sources, but by revenue collected from the use of the specific infringed work. *Wood v. Houghton Mifflin Harcourt Pub. Co.*, 589 F, Supp. 2d 1230, 1245 (2008). In addition, Plaintiff has shown that Defendants actually received revenue from the infringing conduct and that use of Plaintiff's photograph contributed to one of the key pillars of Defendants business growth strategy. See *Andreas v. Volkswagen of America, Inc.*, 336 F.3d at 797, 67 U.S.P.Q.2d 1429 (8th Cir. 2003). Plaintiff has met her burden of demonstrating some causal link

Case 4:21-cv-00557-RK   Document 113   Filed 03/06/23   Page 44 of 49

between the infringement and the particular profit stream, the burden-shifting provisions of § 504(b) apply. *Id.*

The Supreme Court has held that "an infringer who commingles infringing and noninfringing elements 'must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him.' " *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 567, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (quoting *Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 406, 60 S.Ct. 681, 84 L.Ed. 825 (1940)).

Consistent with its obligations, Plaintiff identified the revenue which had a relationship to the infringing activity of Defendants. Importantly, "[t]he plaintiff is not required at this step to show that the infringement was the primary cause of the defendant's revenues, and a fair degree of inference is allowed."). *Dash v. Mayweather*, 731 F.3d 303, 330 (4th Cir. 2013); see also 4 Nimmer on Copyright § 14.03, 14-34. There is simply no requirement that Plaintiff do more since it is up to the infringer who must show not only expenses but also the amount of profit attributable to factors other than the copyrighted work. See *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 634 (6th Cir. 2020). "Put simply, the burden is on the copyright infringer to prove whatever portion of its gross revenue was not attributable to the infringement: ….any relevant revenue that could be traced back to the infringement can be submitted to the jury, and that it is ultimately for the jury to decide how much profit—after hearing the infringer's mitigating evidence—must be disgorged. *ECIMOS, LLC*, 971 F.3d at 635 citing *Balsley v. LFP, Inc.*, 691 F.3d 747, 769 (6th Cir. 2012). What Defendants are really trying to do is shift its burden of showing that portions of its gross revenue is not attributable to the infringement to the Plaintiff. That is not the law and that burden remains with the Defendant.

9

Unlike the cases cited by Defendant, Plaintiff has shown a nexus between the infringing conduct and Defendants revenue. In actuality most of the cases cited by Defendant were after a trial where the issue for damages was presented to the ultimate fact finder. The primary case cited by the Defendant was the *Andreas v. Volkswagen of America, Inc*., 336 F.3d 789, 795 (8th Cir. 2003), which does not support granting summary judgment. In actuality, the Andreas court **reversed** the trial court for granting the Defendant's motion for directed verdict on Plaintiff's claim for indirect profits. That is the exact opposite of what the Defendant is arguing. *Andreas* actually supports the denial of summary judgment here. *Andreas* held that although no customer testified that the purchase was caused by the infringing commercial, there was evidence to support a nexus between the infringement of a copyrighted work and defendant's revenue because, just like here, the infringement was an important part of the manufacturer's sales efforts. *Id* at 797. As stated in *Andreas*, once the plaintiff established the casual connection between the infringing use and the revenue, the burden was on the manufacturer to establish the extent other factors contributed to the sales. *Id*.

Likewise, in *Dash v. Mayweather*, a plaintiff could not prove that anyone purchased a ticket to the Wrestlemania pay-per-event based on the entrance music used by the wrestlers. 731 F.3d 303, 332 (4th Cir. 2013). In this case every time someone viewed Defendants' infringing webpages bearing Plaintiff's photograph, Defendants got paid for the advertisements which were on that page. *Bouchat v. Baltimore Ravens Football Club* is similarly not analogous. 346 F.3d 514, 520 (4th Cir.2003). In *Bouchat,* after a jury trial on damages, the appeals court agreed that after the copyright owner established the amount of the infringer's gross revenues, the "burden shifts to the infringer to prove either that part or all of those revenues are deductible expenses, i.e. not profits or that they are attributable to factors other than the copyrighted work." *Id*. However,

10

in *Bouchat*, the plaintiff sought all of Defendant's profits without regard to the source. The Appeals court noted that the defendant had six distinct streams of revenue and that only two were based on the sale of infringing merchandise. *Bouchat* 346 F.3d at 523. The district court held that the plaintiff was not entitled to revenue from the non-infringing streams of revenue. *Bouchat* 346 F.3d 518-519. The appeals court affirmed. *Bouchat* 346 F.3d at 526. Here, **Mr. Harrington identified Defendants' streams of revenue and he omitted those streams from consideration which were not related to revenue from Defendants' infringing acts**.

In *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir.2004), after two trials and two jury verdicts, the Ninth Circuit again addressed what sufficed to establish a causal connection between copyright infringement and an infringer's profits. In *Polar Bear*, defendant Timex Corporation used copyrighted images from plaintiff's promotional film to boost sales, and plaintiff sought actual damages and indirect profits under § 504(b). *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 704, 707 n.5 (9th Cir.2004). After a jury trial, the court rejected the jury's award because the plaintiff had failed to show that the infringement was actually viewed by **any** customers. The infringing use was related to a trade show where there were **no customers**. *Id* at 715. In the present case, there is no dispute as to direct revenue from customers viewing the photograph as that is the very nature of Defendants' online advertising revenue model. Plaintiff's photograph was the main and central image on Defendants webpage. Once a webpage visitor viewed plaintiff's photograph, the website would record an impression and Defendants would receive revenue as a result of the view of the photograph. Likewise, customers viewing Plaintiff's photograph would click the Subscribe Now feature on each of Defendants' websites featuring Plaintiff's photograph, subscribing to the digital publication and causing Defendants to receive income.

11

Moreover, Defendants left out the most relevant part of his testimony where Mr. Harrington confirmed his sound methodology the rationale and reasonable bases for his advertising revenue opinions. In addition, Defendants' completely ignored Mr. Bybee's report where he stated unequivocally that Defendants' use of Plaintiff's image contributed to the generation of advertising and new subscriber revenue. (Exh. B, Bybee Supp Report pg. 4). Plaintiff has thus shown a causal link between the infringement and Defendants' revenue, such that it can elect to recover profits and present proof at trial and therefore summary judgment should be denied.

## CONCLUSION

Based on the argument, objections, statements of additional disputed facts, and controversies contained herein, Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted,

**McDowell, Rice, Smith & Buchanan, P.C.**

By:      /s/ *Arthur K. Shaffer*
Arthur K. Shaffer, #51,229
Thomas R. Buchanan, #45612
McDowell, Rice, Smith & Buchanan, P.C.
605 W. 47th St., Suite 350
Kansas City, MO 64112
Telephone: (816) 753-5400
Facsimile: (816) 753-9996
ashaffer@mcdowellrice.com
Attorney for Plaintiff

12

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed electronically with the United States District Court for the Western District of Missouri, this 6th day of March, 2023, with notice of case activity generated and sent electronically to all counsel of record.

/s/ *Arthur K. Shaffer*