# Daubert Mot. (Harrington) Exhibit C – Depo. of James Harrington

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF MISSOURI
 3                      WESTERN DIVISION
 4   STEPHANIE CAMPBELL,
 5            Plaintiff,
 6       -vs-                    Case No.:  4:21-cv-00557-RK
 7   GANNETT COMPANY, INC., et al.,
 8            Defendants.
 9   _____/
10                      DEPOSITION OF
11              JAMES HARRINGTON, CPA, CFF
12                   October 11, 2022
                        10:23 a.m.
13
14
15                       Taken at:
16                 MDD Forensic Accountants
17              3155 West Big Beaver, Suite 205
18                     Troy, Michigan
19
20
21
22
23   Court Reporter:
24   Patricia A. Everett, CSR-4602, Notary Public
25
```

**Daubert Mot. (Harrington) Ex. C - (Depo. of James Harrington)**

Veritext Legal Solutions
www.veritext.com                                    888-391-3376
Case 4:21-cv-00557-RK   Document 130-3   Filed 03/17/23   Page 2 of 7

Page 2
1  APPEARANCES:
2      On behalf of the Plaintiff (via videoconference):
3          McDOWELL, RICE, SMITH & BUCHANAN, P.C.
4          605 West 47th Street, Suite 350
5          Kansas City, Missouri  64112
6          (816) 753-5400
7          BY: MR. ARTHUR K. SHAFFER
8              ashaffer@mcdowellrice.com
9
10     On behalf of the Defendant (via videoconference):
11         LEWIS RICE LLC
12         600 Washington Avenue, Suite 2500
13         St. Louis, Missouri  63101
14         (314) 444-7729
15         BY: MR. JOSEPH E. MARTINEAU
16             MS. LINDSEY M. BRUNO
17             jmartineau@lewisrice.com
18             lbruno@lewisrice.com

Page 3

           TRANSCRIPT INDEX

                              PAGE
    Appearances                  2

    Index of Exhibits            4

    Examination by Mr. Martineau 5

    Reporter's Certificate      77

Page 4
                INDEX OF EXHIBITS

    DESIGNATION       DESCRIPTION        MARKED
      (Attached to transcript)
       * attorneys eyes only
       + subject to protective order

    Exhibit A (unredacted report)*+         74
    Exhibit B (redacted report)+            74
    Exhibit C (notice of deposition)        74
    Exhibit D (ESPN agreement)*             74
    Exhibit E (KGO agreement)*              74
    Exhibit F (freelance agreement)         74
    Exhibit G (one-time submission agreement)+  74

Page 5

                Troy, Michigan
                Tuesday, October 11, 2022
                At or about 10:23 a.m.
                        - - -
            J A M E S   H A R R I N G T O N,
    having first been duly sworn, was examined and testified
    on his oath as follows:
                    EXAMINATION
    BY MR. MARTINEAU:
    Q   Mr. Harrington, we spoke briefly off the record, but my
        name is Joseph Martineau.  I'm with a law firm in St.
        Louis called Lewis Rice, and I represent the defendants
        in this action that's been brought by Stephanie
        Campbell, in which you have been engaged to provide
        certain opinions and reports.  And I'm going to ask you
        some questions about your -- about your opinions and
        your reports and ask that you answer those as accurately
        and truthfully as you possibly can, and I'm sure you
        will.  Is that agreeable?
    A   Yes, it is.
    Q   Okay.  And I'm sure you've been -- I see from your CV
        that you have been deposed before, so I'm not going to
        waste time going through the rules.  You understand
        those; correct?
    A   I do.

2 (Pages 2 - 5)
Case 4:21-cv-00557-RK    Document 139-3    Filed 03/17/23    Page 3 of 7
www.veritext.com                                              888-391-3376
Veritext Legal Solutions

Page 6

1 Q Okay. Would you state your full name for the record,
2   please?
3 A It's James John Harrington.
4 Q And you're from Troy, Michigan; is that correct?
5 A That's where our office is located, yes.
6 Q Okay. And that's a suburb of Detroit, I understand?
7 A Yes, it is.
8 Q Okay. And how old a gentleman are you?
9 A Sixty-one.
10 Q And briefly, if you could just run through your -- I've
11   seen your CV. I don't need a lot of detail, but if you
12   could just briefly tell me your education and degrees,
13   starting with college?
14 A Sure. I have a bachelor's of science in accounting
15   degree from Oakland University here in Rochester,
16   Michigan. I graduated in 1995 with that degree.
17 Q Okay. And are you a CPA?
18 A Yes, I am.
19 Q And you have other certifications; is that correct?
20 A I do.
21 Q And what are those?
22 A I'm certified in forensic, financial forensics by the
23   American Institute of CPAs, and I also -- this isn't
24   reflected on my CV, but I also recently received a
25   certification in certified valuation analyst from the

Page 7

1   National Association of Certified Valuators and
2   Analysts, NACVA.
3 Q Okay. All right. When you talk about being certified
4   in financial forensics, what is that exactly?
5 A It's a certificate granted by AICPA to professionals who
6   have significant background and experience in forensic
7   accounting matters.
8 Q And a certified valuation analyst, exactly what is that?
9 A That's a certification that is related to business
10   valuation practice. It's a -- it was a week-long course
11   that was followed by an exam and then a requirement to
12   submit a case study providing a business valuation in a
13   hypothetical manner.
14 Q And you referenced that that certification is not
15   included on your CV that you submitted with your report;
16   is that correct?
17 A That's correct.
18 Q Okay. Is all the information that is submitted on your
19   curriculum vitae, is that true and accurate, to the best
20   of your knowledge, at the present time?
21 A Yes, it is.
22 Q And where are you employed, sir?
23 A With MDD Forensic Accountants.
24 Q Okay. And tell me a little bit about what that is.
25 A MDD is a forensic accounting firm. We are an

Page 8

1   international firm with 40 offices worldwide, with the
2   majority of the offices in the United States. The firm
3   does not have a traditional accounting practice, such as
4   audits and taxes. We are purely a forensic accounting
5   firm, specializing in the -- in forensic accounting
6   matters, including loss and damages determinations.
7 Q Is a good part of the practice of your firm providing
8   opinions for litigation?
9 A I would say the majority of the practice is related to
10   insurance loss work, but a significant -- a large
11   portion is also related to expert witness and damages
12   studies.
13 Q Okay. How about your practice, is -- is it mostly as an
14   expert witness or does it include insurance loss
15   matters?
16 A Mine is probably 95 percent expert witness work.
17 Q Okay.
18 A The occasionally helping out an insurance loss matter,
19   but I'm primarily a litigation damages person.
20 Q Okay. How long have you been a CPA?
21 A Oh, gosh, since 1997.
22 Q And when did you get your certification in financial
23   forensics?
24 A I believe that was introduced by the AICPA, gosh, I want
25   to say it was in the mid 2000s, maybe late 2000s, when

Page 9

1   they introduced that certification and I obtained it
2   then.
3 Q Is that about the time you got in, as well?
4 A Yes.
5 Q Okay. So you're part of the original class?
6 A I was, yes.
7 Q Okay. With respect to your experience as an expert
8   witness, you said it was about 95 percent, how many of
9   those cases have involved copyright claims?
10 A I did a count yesterday, and, you know, I've been doing
11   this sort of work for over 23 years now, so going way
12   back it's a little harder to remember. But I was able
13   to identify five matters that I worked on that involved
14   strictly copyright claims.
15 Q And how many of those copyright cases that you were
16   involved in were in the last four years?
17 A Well, including this one, there were, gosh, I think two
18   others, maybe a third.
19 Q And when you said you had five situations or five
20   matters involving strictly copyright were you counting
21   this one, as well? This case, as well?
22 A No.
23 Q No, okay. So you've had six counting this case?
24 A Well, as I can recall, yes.
25 Q Okay. No, I understand, I understand. When were you

3 (Pages 6 - 9)

Case 4:21-cv-00557-RK    Document 139-3 Soluti Filed 03/17/23    Page 4 of 7
Veritext Legal Solutions
www.veritext.com                                            888-391-3376

Page 50

1  interested in seeing that story or that video they're
2  also being exposed to these advertisements on the
3  individual pages.
4  Q    But is it fair to say that the advertiser is not
5  purchasing that space on the web page for the purpose or
6  with the intent of being associated with that
7  photograph?
8  A    Well --
9           MR. SHAFFER:  Objection, form.
10          THE WITNESS:  No, I'm -- as I understand
11 the advertising model, that the defendants sell
12 advertising to their customers, who are paying to have
13 as many eyeballs as they can possibly obtain see their
14 ad.  And if -- if some stories and -- and information on
15 these sites draw more people to them then all the
16 better.
17          So having content that drives viewers and
18 drives users and visitors to the sites increase that
19 traffic, then there's greater opportunity for ad
20 revenue.
21 BY MR. MARTINEAU, CONTINUING:
22 Q    Okay.  What's the difference, then, between the use of
23 this photograph and anything else that's on the website?
24 A    Presumably they have rights to use those other
25 photographs.

Page 51

1  Q    Okay.  Are you familiar with the concept of programmatic
2  advertising?
3  A    No, I'm not.
4  Q    Okay.  Do you have any information whatsoever that this
5  particular photograph was used as inducement for any
6  advertiser to commission any advertising?
7  A    Specifically?
8  Q    Yes.
9  A    No.
10 Q    You would certainly agree with me that plaintiff's
11 photograph was an infinitessimal amount of total Gannett
12 content on the defendants' websites?
13          MR. SHAFFER:  Objection, form.
14          THE WITNESS:  I have no way to determine
15 that since the entirety of my revenue analysis is
16 related to overall advertising revenue generated by
17 Gannett from their 10-Ks.
18 BY MR. MARTINEAU, CONTINUING:
19 Q    Paragraph 45 of your report, Mr. Harrington, you say --
20 let me -- where's my paragraph 45?  Bear with me just a
21 second.
22          Paragraph 45, you say that a study of
23 recoverable revenue would necessarily focus on
24 advertising revenues earned by the Gannett defendants
25 associated with the publishing segment, including any

Page 52

1  ads placed on any web pages containing a copyrighted
2  photograph and for any other revenue which can be
3  allocated to the use of the photograph.  That's
4  something that is in your report; correct?
5  A    Yes, it is.
6  Q    Okay.  Would you agree that there must be more than just
7  revenue allocated to the use of the photo; in fact, that
8  the revenue must be generated because of the photo?
9           MR. SHAFFER:  Objection, form.
10          THE WITNESS:  I guess the -- again, the
11 foundational element of my analysis is that the web page
12 that has the photograph is related to the story, and the
13 advertising that is on that page would be attributed to
14 the use of the photograph.
15 BY MR. MARTINEAU, CONTINUING:
16 Q    But the advertisement that's on that page is -- why is
17 it attributed to the photograph?  That's what I don't
18 understand.
19 A    Again, you're generating -- you're -- you're attempting
20 to generate viewers and users to see the page, and then
21 by default be exposed to the advertising that is
22 resident on that page.
23 Q    Are you suggesting, then, that but for the use of the
24 photograph that revenue would not have been received?
25          MR. SHAFFER:  Objection, misstates his

Page 53

1  testimony.  Form.
2           THE WITNESS:  No, that's not -- that's
3  not how, as I understand it, disgorgement analysis
4  works.  This -- they have in this -- in this matter
5  Gannett has -- and the defendants have advertising
6  revenues that were earned from the advertisers that are
7  placing ads on the page that contains the copyrighted
8  photograph.
9  BY MR. MARTINEAU, CONTINUING:
10 Q    So it doesn't matter to you, then, that it was a
11 photograph of me that's on that page.  As long as
12 there's advertisement associated or adjacent to that
13 page then that's revenue that's appropriately considered
14 for purposes of disgorging profits?
15 A    As a starting -- starting point, yes.  Now, the -- the
16 -- from the defendants' side in a matter such as this
17 they'll look at that and presumably say, well, there are
18 a couple of things on there that may be -- you may be
19 able to attribute some of the advertising revenue to
20 those items or elements of the -- of the web page.
21          That is -- that is data that I haven't
22 seen, and as I understand Mr. Shaffer has asked for
23 repeatedly that we haven't -- we haven't gotten.  So
24 that -- that sort of attribution of revenue to just the
25 photograph is -- is sort of an exercise that is beyond

14 (Pages 50 - 53)

Veritext Legal Solutions
www.veritext.com                                            888-391-3376

Page 62

1  B, Art.
2  BY MR. MARTINEAU, CONTINUING:
3  Q  Chart 310, chart 311 and chart 312. Let me find them
4     myself. As I read those, each one of them shows at
5     least for 2020 negative revenues. Is that -- is that a
6     fair reading of those?
7  A  No.
8  Q  No, okay. Let's go to chart 310, then, where you've got
9     the figures there. You've got figures for publishing
10    revenue?
11 A  Yes.
12 Q  Okay. And that's 3.08 million?
13 A  Yes.
14 Q  Okay. And you've got publishing expenses of 3.268
15    million?
16 A  Yes.
17 Q  And that would show negative revenues for publishing; is
18    that correct?
19 A  Yes. Well, no, it's not negative revenues.
20 Q  Okay.
21 A  It would be at that level an operating loss.
22 Q  An operating loss, okay, so I misspoke. So in 2020,
23    then, as far as chart 310 shows, Gannett had an
24    operating loss of $447,880; is that correct?
25 A  Yes.

Page 63

1  Q  And that's according to the 10-K?
2  A  Yes.
3  Q  And its publishing segment had a loss of close to
4     $200,000; is that correct?
5  A  Within reason. I mean, depending on how the
6     intersegment and eliminations are considered here, but,
7     yeah, I would say that's probably a reasonable
8     assessment of the operating performance of the
9     publishing segment.
10 Q  The three -- and this is in thousands -- the 3.268
11    publishing expense is certainly greater than 3.080
12    publishing revenue; correct?
13 A  Yes, it is.
14 Q  Okay. And going to the next chart that you have, which,
15    I guess, is 311, that likewise shows negative operating
16    income in 2020; is that correct?
17 A  Yes, it does.
18 Q  Okay. And it also shows -- oh, that's fine.
19          Moving to the next one, that chart also
20    shows negative operating revenue; correct?
21 A  Operating income.
22 Q  Of 2020? I'm sorry?
23 A  Operating income.
24 Q  Operating income for 2020; is that correct?
25 A  Yes.

Page 64

1  Q  What is -- I mean, just generally speaking what is chart
2     310 showing?
3  A  Can we go back up?
4  Q  Yep. Yeah.
5  A  This is consolidated operating results of Gannett.
6  Q  Okay. That all comes from the 10-K?
7  A  Yes.
8  Q  Okay. What's the significance of that information
9     however, insofar as it relates to this case?
10 A  Well, I want to be able to sort of track my way through
11    the financial data to get to what we would consider the
12    accused revenues, advertising revenues. And this is
13    just sort of a stairstep set of worksheets.
14 Q  Okay. Same question with respect to chart 311. What is
15    that doing?
16 A  That's just looking at the publishing segment as a
17    stand-alone.
18 Q  Okay. So that chart 310 would include all revenue and
19    expense items as shown on the 10-K?
20 A  Yes.
21 Q  Okay. And chart 311 shows just the publishing revenue
22    and expenses from the 10-K?
23 A  The publishing segment, yes.
24 Q  Publishing segment, okay. And then chart three -- with
25    the staple it's hard -- 312, that's the DMS segment?

Page 65

1  A  Correct.
2  Q  Okay. Does the fact that each of these three sharts --
3     charts, rather, show negative -- well, the first two
4     show negative operating income, or all three show
5     negative operating income. Does that in any way affect
6     your analysis in this case?
7  A  No.
8  Q  Okay. Why not?
9  A  We're -- our burden -- or, my burden as the plaintiff
10    expert is to identify the revenues that are associated
11    with the infringement. The defendants' burden is to
12    identify the costs that are properly deducted from those
13    -- those accused revenues.
14 Q  Okay. And you're making the assumption that the
15    defendant has the burden to parse out the revenue that's
16    generated specifically from that photograph?
17 A  Well, I --
18        MR. SHAFFER: Objection, form.
19        THE WITNESS: I don't know if -- that
20    seems to be a little bit backwards than the way I look
21    at it. Their burden is to identify the revenues that
22    are not properly attributed to that use.
23    BY MR. MARTINEAU, CONTINUING:
24 Q  And does the plaintiff, in your judgment, have any
25    burden to identify the revenues that are attributable to

Page 70

1  be the relevant chart?
2  A  To remove it?
3  Q  Yeah.
4  A  I believe it's 201, if we go down.
5  Q  Okay.
6  A  Yes.  You would eliminate the four -- 411,940 and the
7     441,394.
8  Q  Okay.  All right.  In your attachments 300, 301 -- or,
9     300 and 301, what are those doing?
10 A  That's -- well, 300 is just sort of a different sort of
11    the different types of revenue from the 10-Ks.
12 Q  What about 301?
13 A  Again, it's just another spread of the total revenue
14    reported in the 10-Ks.  As you can see in the 2020
15    revenue in the total line, we get to the 3.4 billion in
16    2020 and then the 3.2 billion in 2021.
17 Q  Okay.  And again, all these -- all these figures come
18    directly from the 10-K?
19 A  Yes.
20 Q  Okay.  Let's go to paragraphs 49 and 50 in Exhibit B.
21    Tell me what you're doing there.
22 A  I'm explaining my understanding of the different ways
23    that Gannett reports revenue by segments or by source
24    and type.
25 Q  Well, wait a minute.  I just noticed your report, if you

Page 71

1     look at page 19, the 49 and 50 that I'm referring to
2     actually follow paragraph 60.  I think your automatic
3     numbering was --
4  A  Oh, my gosh, you're right.
5  Q  Okay.  Those are the paragraphs I was referring to, sir.
6  A  I thought, wow, we want to talk about 10-K numbers
7     again.  I'm -- that is interesting.
8  Q  Bill Gates and Microsoft deciding something that we may
9     not agree with.  It happens to me all the time, that
10    somehow numbering gets screwed up when you've got auto
11    numbering.
12       But anyway, I'm referring to the second
13    paragraph 49 and second paragraph 50.
14 A  49A and 50A.
15 Q  Yeah, okay.
16 A  Okay.
17 Q  Tell me what you're doing there.
18 A  I was asked to include a section in the report that
19    addressed the -- the damages looking at it from a
20    statutory damages framework.  And what I've done here is
21    take what I understand to be the statutory damages
22    recovery in a copyright case and presenting the amounts
23    first at the low end if it's 750 per infringement, and
24    then the high end of 30,000 per infringement, and then
25    calculating a midpoint, and then adding a final column

Page 72

1     to calculate the damages if -- if it's found to be
2     willful infringement.
3  Q  Okay.  And the midpoint is just a function of adding the
4     two numbers together from low and high and then dividing
5     by two?
6  A  Yes.
7  Q  Okay.  All right.  And then again, you've used the
8     multiplier of 17 in each case?
9  A  Correct.
10 Q  Okay.  Let's take a couple minute -- let's take five
11    minutes.  Let me check with Lindsey, and I think we're
12    close to being done.
13 A  Okay.
14       MR. SHAFFER:  Okay.
15       (Recess from 12:27 p.m. to 12:35 p.m.)
16 BY MR. MARTINEAU, CONTINUING:
17 Q  Just one final question, Mr. Harrington.  I just want to
18    be clear on this.  I think it's clear from your
19    testimony so far, but you have not reached any
20    determination regarding a causal connection between the
21    alleged infringement and any revenues that were derived
22    by Gannett or any of the defendants; is that fair?
23       MR. SHAFFER:  I'm going to object.  Form.
24       THE WITNESS:  I've assumed it exists,
25    because if the photo appears on a web page that has also

Page 73

1     advertising on that page, then there is advertising
2     revenue associated with the use of that photograph on
3     that page.
4  BY MR. MARTINEAU, CONTINUING:
5  Q  Okay.  Winnowing that down a little bit, you have not
6     reached a determination regarding a causal connection
7     between the infringement and any specific revenues
8     derived by Gannett or any of the defendants?
9        MR. SHAFFER:  I'm going to object as to
10    form again.
11       THE WITNESS:  I've brought it down in
12    terms of advertising revenue as far as I can, given the
13    documents that have been produced in this case.
14 BY MR. MARTINEAU, CONTINUING:
15 Q  Okay.  And you haven't made any determination as to
16    amount of revenues that were resulted or that were
17    caused by the infringement alleged in this case?
18       MR. SHAFFER:  Same objection.
19       THE WITNESS:  When you say caused, I
20    guess maybe I'm struggling with that word.  I think -- I
21    think the specific revenues associated with the use of
22    the -- the infringing photograph, I haven't gotten to
23    that level yet.
24 BY MR. MARTINEAU, CONTINUING:
25 Q  Okay.  Okay.  That's all I have.  Thank you, sir.  I

19 (Pages 70 - 73)

Veritext Legal Solutions
www.veritext.com                                                                888-391-3376